UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
ROBERT VITIELLO,

                              Plaintiff,

                                                            Docket No: 19-cv-3465

      -against-
                                                            **COMPLAINT**

                                                            Plaintiff Demands a Trial by Jury

COUNTY OF NASSAU,

                              Defendant.
--------------------------------------------------------x

      Plaintiff, ROBERT VITIELLO, by his attorney, Raymond Negron, Esq., files this

Complaint and alleges as follows:


## NATURE OF THE ACTION

1.     This is a citizen action brought against the COUNTY OF NASSAU, New York

("COUNTY OF NASSAU") pursuant to Sections 309(b) and (d) of the federal Clean

Water Act ("CWA"), 33 U.S.C. §§ 1319(b) and (d), for the COUNTY OF NASSAU'S

numerous illegal and continuing discharges of pollutants, including raw sewage, into

waters of the United States from its municipal and private sewer system in violation of

Section 301(a) and 402(p)(3)(B) of the CWA, 33 U.S.C. § 1311(a) and § 1342(p)(3)(B).

This action is also brought under sections 504(a) and 505 of the CWA, 33 U.S.C. §

1364(a), to require the COUNTY OF NASSAU to take such actions as may be necessary

to abate the imminent and substantial endangerment to the health of persons affected by

the COUNTY OF NASSAU's sewer system and collection system resulting in discharges

of raw and untreated effluent and sewage to waters, homes, yards, parks, playgrounds,

aquifers and water bodies; seeking injunctive relief and civil penalties for the COUNTY

OF NASSAU'S failure to comply with the CWA in its discharge of pollutants from its

municipal wastewater collection system and private property wastewater collection

system and satellite systems within its jurisdiction without a National Pollutant Discharge

Elimination System ("NPDES") permit authorizing such discharges in violation of

Section 301 of the CWA, 33 U.S.C. § 1311; for COUNTY OF NASSAU'S failure to act

to enforce its contract rights with UNITED WATER LONG ISLAND ("UNITED

WATER") and SEVERN TRENT ENVIRONMENTAL SERVICES, INC. ("SEVERN

TRENT") regarding past, existing and continuing violations of the Environmental

Protection Agency ("EPA") and New York State Department of Environmental

Conservation ("DEC") regulations for non-reporting, illegal discharges, excessive flows,

lack of public education, lack of maintenance of private and public sewer lines, lack of

enforcement of ordinances, lack of management of the GLEN COVE, CEDAR CREEK

and BAY PARK wastewater treatment plants permitting, among others, excessive

mercury levels, excessive fecal coliform levels and other exceedences; for failing to

protect the citizens of the COUNTY OF NASSAU and citizens utilizing the waters of

Long Island Sound, bays, tributaries and waterways that are polluted and contaminated

due the negligence and recklessness of COUNTY OF NASSAU and SEVERN TRENT;

due to its failure to control, enforce contract rights, protect citizens and environment,

oversee, manage and communicate with UNITED WATER and SEVERN TRENT

regarding contracts and contract assignments for the operation of the COUNTY OF

NASSAU sewer collection system and the COUNTY OF NASSAU wastewater treatment

plants;  permitting citizens of the COUNTY OF NASSAU to be in violation of the CWA

for illicit discharges on private property due to a lack of public education, enforcement of

sewer use ordinances, inconsistent and outdated sewer use laws, regulations and ordinances, and for failure to put residents on notice of aging sewer laterals, connections, spurs, wye connections, breaks, cracks, the effects of chemicals on corrosive materials and generally assisting residents to inspect, repair and replace private property sewer laterals; taking steps to reduce and control excess infiltration into the COUNTY OF NASSAU's collection system causing sanitary sewer overflows ("SSO'S") resulting in contamination of water bodies, the Great South Bay and the Long Island Sound; for COUNTY OF NASSAU'S failure to undertake proper reporting, research, enforcement, education and compliance with all aspects of the CWA; for entering a contract with UNITED WATER that rewards UNITED WATER for excess flows to the COUNTY OF NASSAU treatment plants rather than penalizing UNITED WATER; for entering a contract with UNITED WATER that requires the expenditure by the COUNTY OF NASSAU of public funds for private responsibilities in the maintenance of sewer laterals; for being on notice for years, and for the past number of years while prior related actions have been pending, of infiltration and excess flows that have resulted in sanitary sewer overflows causing contamination and beach closures; for failing to take any steps to enforce the COUNTY OF NASSAU sewer ordinance; and exposing residents and the COUNTY OF NASSAU to statutory fines in the amount of $51,570 per day for each violation until January 14, 2017, and $52,414 per day for each violation subsequent to January 14, 2017, pursuant to Section 309 of the Clean Water Act, 33 U.S.C. 1319(d) and the Federal Civil Penalties Inflation Adjustment Act of 1990.

2.      The purpose of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251 (a).  To that end, the CWA

prohibits the unlawful "discharge of any pollutant by any person" into the waters of the United States, the contiguous zone, or bays and sounds. 33 U.S.C. § 1311(a), 402(a) of the CWA, 33 U.S.C. § 1342(a).  The COUNTY OF NASSAU has failed to comply with the CWA and as a result, there is ongoing contamination of the Long Island Sound, the Great South Bay, and the aquifers under Long Island that supply drinking water to the residents of Long Island. The COUNTY OF NASSAU has failed to protect these important water bodies, and has put its residents at risk for fines and penalties for leaking and outdated sewer pipes that connect residences to the municipal sewer system, and for overloaded and outdated wastewater treatment plants. By failing to educate the public about sewer pipes that are beyond their lifespan, and by failing to enforce sewer use ordinances, the resident taxpayers of the COUNTY OF NASSAU now face millions of dollars of fines and penalties, on their own, and as taxpayers of the COUNTY OF NASSAU due to the long term neglect of sewer laterals, sewer mains, treatment plants, and outfall pipes, the present fines to the COUNTY OF NASSAU total Fifty Seven Million, Seven Hundred Seventy Four Thousand ($57,774,420.00) Dollars.  The COUNTY OF NASSAU has put financial savings before clean water, and has promoted the contamination of water bodies and groundwater through unpermitted and uncontrolled leaking, broken and corroded buried sewer lines that have been, and are presently, causing a deterioration of water quality, brown tide, sanitary sewer overflows and numerous other dangerous and life threatening conditions. The COUNTY OF NASSAU has been on notice of these dangers for years and has chosen to ignore the dangers and catastrophic effects of neglected sewer lines and laterals and instead unnecessarily place financial burdens on taxpayers and residents who are unaware of the

huge costs involved in fixing private property sewer laterals when they collapse, crack, leak and fall into disrepair due to their age, their condition due to groundwater, the corrosive effects of Hydrogen Sulfate within the pipes, and leaks due to improper spur connections.

3.      Wastewater collection and transmission systems are designed to collect and transport wastewater from domestic, commercial, and industrial sources to treatment plants for processing. The process begins when service laterals or sewer pipes convey the wastewater away from the buildings where it connects to a sewer main. The sewer main then transports the wastewater to the treatment plant or a pump station where it is pumped into the treatment plant. Once treated, the water is discharged into a stream or a larger body of water.  The design of the lateral pipe bringing wastewater from a residence to the main in the street is gravity, not pressure, so that the wastewater collects in the pipe before it makes it's way to the main connection. This permits strong fumes to rise to the top of the pipe, underground, causing a crack. That crack permits rain and ground water to enter the pipe, mixing with wastewater, and overloading the treatment system. The additional treatment requirements add treatment costs, create overflows, and generally overwhelm the collection and treatment works.

4.      Sewers first came to Nassau County in the first half of the twentieth century.  Initially, there was a planned village-wide sewer system in the Village of Freeport in 1909. In 1916, a committee reported that Freeport had 1788 cesspools, 951 grease traps and 758 privies. Sewer pipes would have to be placed in the middle of the street since water mains were located on the north and west sides of streets and gas mains ran on the south and east sides of streets.  The cost of that initial system was estimated to

be $585,000 and included 56,221 feet of trunk sewers and a sewage treatment plant. Between 1927 and 1928 a pumping station, treatment plant and a portion of the trunk sewers were constructed and the Village of Freeport was divided into seven lateral districts. A referendum for the installation of a southern sewer system was passed in 1948. Those living in the southernmost sections of Freeport had to wait until the early 1950s, when the construction of pumping station was completed. In 1979, Freeport began to connect its sewerage disposal system with that of Nassau County. The Nassau County Sewer and Stormwater Authority is responsible for the operation of Nassau County's sewage treatment plants, the Bay Park Sewage Treatment Plant and the Cedar Creek Water Pollution Control Plant. Villages, including Freeport, collects sewage generated in their villages and pumps it into Nassau County facilities for treatment. The County is also responsible for the Glen Cove Treatment Plant.

5.      The Village of Freeport is just one example of a collection system that is aging and is being neglected in the County of Nassau. For example, currently, the Village of Freeport has 14,196 housing units that have outdated and aging sewer laterals connected to those homes. The average age of a house in Freeport is eighty years old, built prior to 1930. Homes in the Village of Freeport average over 50 years, and their connections to the Village of Freeport sewer collection system are also aging. EPA and other government reports confirm that the lifespan of a cast iron sewer pipe is between 20 and 50 years. Thus, homes in the Village of Freeport have sewer laterals that are well beyond their lifespan. This leads to breaks, leaks, cracks and a general breakdown in the condition of the pipe.

6.      The Village of Freeport has a sewer use ordinance similar to that found in the

County of Nassau and the villages, cities and towns in the County of Nassau.  These

ordinances are never enforced, and the County of Nassau has failed to take any

enforcement steps with the municipalities whose collection systems collect and transmit

sewage to the County treatment plants. For example, § 176-10 of the Freeport Village

Sewer Ordinance states:

> B. All costs and expenses incident to the installation and
> connection of the building sewer and/or building lateral shall be
> borne by the owner. The owner shall indemnify and save the
> Village harmless from any loss or damage or expenses, claims
> or suits arising out of or in connection with the installation and
> connection of the building sewer and/or building lateral. All
> building lateral and building sewer connections must be
> maintained in good working condition at the expense of the
> property owner. All necessary repairs shall be promptly made at
> the expense of the property owner.

7.      Private sewer lateral ordinances are a means of improving a sewage collection

system. Sewer collection systems are supposed to be closed, which means no other water

should get in through broken sewer pipes. When this occurs, excessive volume goes to

the wastewater treatment plant causing overflows during and after rain events. Proper and

regular maintenance of private property sewer laterals decrease and control infiltration,

leading to less frequent and less severe sanitary sewer overflows. Because homeowners

are likely to be unaware of the details of their lateral ownership, the Clean Water Act

requires public education so that governments and wastewater agencies communicate the

detail of the ordinance to residents. Governments are also required to enforce their sewer

use ordinances to prevent infiltration and exfiltration of rain and groundwater leading to

sanitary sewer overflows and contamination.

8.      It should not be surprising that the sewage collection systems in the County of Nassau are in poor condition given the age of the buried sewer laterals. Defects in the pipes, such as cracks opened by tree roots, compromise the sewer system. Spills known as sanitary sewer overflows occur when sewage is released from the sewer system and runs into streets, waterways, or even indoors. Intentional releases also occur, when the capacity of wastewater facilities is exceeded, due to infiltration of excess flow into the collection system. This leads to an event known as a bypass, which occurs when the County wastewater facilities are forced to discharge raw sewage that has only been partially treated. Untreated sewage that reaches the Great South Bay, the Long Island Sound and its contributing waters pose a human health threat to those that use it for recreational activities such as swimming. The bacteria and viruses in sewage cause skin and sinus infections, and digestive disorders. The nutrients in sewage are also disruptive to the chemical balance of a body of water, depleting oxygen and threatening plant and animal life.  As the result, the Great South Bay and the Long Island Sound have a long history of both pollution and adaptation. Oystering and clamming have been abandoned in the Bay due to poor conditions caused by water pollution.  After the passage of the Clean Water Act in 1972, it was expected that new sewage treatment standards would contribute to vast improvements in water quality, but with an increased human population and a degraded system of sewer pipes, water quality has not improved. Sanitary sewer overflows pollute the water every day. Overflows from the Nassau County treatment plants violate the EPA Clean Water Act as do the source and cause of those overflows, infiltration from aging and broken sewer lateral pipes that are beyond their lifespan. Clean Water Act fines and litigation then result.

9.      Corrosion caused by hydrogen sulfide gas or other sources of acid is the most

frequent cause for pipe deterioration. The production of gasses is hastened by low

velocities in a sewer line, longer detention times, and higher temperatures within the pipe.

Other factors involved in corrosion include stray electrical currents in the surrounding

soil, the presence of toxic materials (metals can reduce bacterial activity), acidity of the

sewage, and turbulence.

10.     A sewer lateral is the pipe that connects a building's plumbing system to the

public sewer. The sewer main is publicly owned, while a lateral is privately owned.

Property owners have full ownership of their lateral, although they may be unaware of

this responsibility until a problem occurs. The sewer lateral is an unseen portion of a

property, transferred from owner to owner in a property sale. Sewer laterals are

commonly old and defective, leading to problematic infiltration. Infiltration is caused by

groundwater and rainwater entering into the sewer system when the water flows through

soil and into cracks or leaks in the pipes. Defects in sewer pipes are frequently caused or

worsened by the intrusion of tree roots.

11.     Exfiltration is the leakage of wastewater out of a sanitary sewer system through

broken or damaged pipes and manholes. Wastewater that leaks out of defective pipe

joints and cracks may contaminate ground and surface water and cause a host of other

problems, including pipe structure failures due to erosion of soil support, and ground

subsidence due to erosion of underground soil. Exfiltration is a big problem facing water

and wastewater infrastructure. Its effects can harm public health and the environment and

necessitate costly repairs. A study done by the city of Albuquerque, New Mexico, staff

estimated that their collection system lost 11 percent of wastewater due to exfiltration. A

study done in England documented 20 to 25 percent of wastewater exiting the system through exfiltration. In another study, German wastewater professionals estimated a cost of nearly $100 billion to repair their deteriorated sewer infrastructure and combat exfiltration. Major points of exfiltration must be identified and repaired as a part of the regular maintenance of wastewater collection systems. Untreated sewage from exfiltration often contains high levels of suspended solids, pathogenic microorganisms, toxic pollutants, floatables, oxygen-demanding organic compounds, oil and grease, and other pollutants. Sanitary sewer systems are designed to collect and transport wastewater to facilities for proper treatment before it is released back into the environment. However, exfiltration allows for the release of wastewater without proper treatment.

12.     When a pipe corrodes to the point that its contents escape into groundwater or waterways, the leakage can make people sick and harm the environment. Leaking and weakened pipes also pose a sinkhole risk; as groundwater seeps into the line, it carries the surrounding soil with it and creates a void that eventually collapses. The groundwater infiltration also robs the collection system of capacity, filling it with water that does not require treatment. Hydrogen Sulfide then results from the conversion of hydrogen sulfide gas converting to sulfuric acid in the presence of moisture within sewer pipes and it then directly attacks cast iron. Hydrogen Sulfide gas is responsible for the corrosion of sewer pipes including connections and other metal components in the collection system. Corrosion occurs most frequently in gravity sewers in which oxygen is depleted due to the activity of microorganisms where there is limited velocity of sewage, such as a sewer lateral on private property. The damage caused by these gases is on the top of the sewer lateral resulting in a crack that permits the infiltration of groundwater and rainwater into

the collection system, as well as the exfiltration of the raw sewage in the sewer lateral that escapes and contaminates the surrounding soil, ultimately travelling to the sole source aquifer that provides drinking water to all Long Island residents. The infiltration of ground water and rainwater causes excess flow to the collection system and ultimately to the Nassau County wastewater treatment facilities where overflows occur.

13.     The 2005 American Society of Civil Engineering assessment of the nation's infrastructure assigned the grade "D" and estimated the five-year investment needs to be in excess of $1.3 trillion. It is estimated that the cost of replacing all water mains in the United States would run to $348 billion. Although the federal government has spent more than $71 billion on wastewater treatment programs since 1973, the nation's 19,000 wastewater systems still face enormous infrastructure funding needs in the next 20 years to replace pipes and other constructed facilities that have exceeded their design life. With billions of dollars being spent yearly for water infrastructure, the systems face a shortfall of at least $21 billion annually to replace aging facilities and comply with existing and future federal regulations.

14.     The EPA estimates that between 23,000 and 75,000 sanitary sewer overflows occur annually nationwide, spilling between three billion and ten billion gallons of untreated wastewater. Heavy rains result in increased flows to wastewater treatment plants, due to infiltration into the collection system. The peak wet weather flow sometimes exceeds a plant's capacity to store and treat all of the sewage before discharging it.  During wet weather, a plant's capacity to apply secondary treatment to all of its influent (untreated sewage entering the plant) may be exceeded. The peak flow is

diverted past the secondary treatment stage, and then reenters the process at the discharge

phase. The Comptroller of the State of New York has reported that 6.5 billion gallons of

untreated combined sewer and storm water were released in 2017. These releases have

negative impacts on drinking water, the quality of shores, rivers, streams and bays, and

the production of high levels of E coli and other dangerous bacteria.

15.     The County of Nassau has been on constructive notice of the poor and aging

condition of the private side of the collection system for years due to available reports

published by the EPA, DEC notices and other organizations that describe in detail the

declining condition of cast iron private property sewer laterals. In particular, the EPA

technical report dated May 1991 cautioned that government inaction regarding the

corrosive effects of Hydrogen Sulfate in private property and public wastewater pipes

would lead to catastrophic events such as sewer pipe collapse and street collapse.

(*Hydrogen Sulfide Corrosion: Its Consequences, Detection and Control*, EPA Office of

Water, September, 1991) This early study was correct; the most common failure of sewer

laterals is cracking on the top of the buried sewer pipe which permits rainwater to

infiltrate the collection system, causing excess flows and SSO's, and exfiltration of raw

sewage into the surrounding ground, causing long term contamination of the sole source

aquifer for Long Island drinking water. The County of Nassau must develop and

implement a sewer line corrosion plan as part of a public education program. The failure

of the County of Nassau has caused sanitary sewer overflows to increase due to excess

flow from sanitary sewer lines on private property based on data that has been available

to the County of Nassau by the DEC and EPA. Since the County of Nassau has neglected

their legal obligations to reduce infiltration and educate the public, the rate of beach

closures due to sanitary sewer overflows caused by infiltration during rain events has increased and still the County of Nassau continues to turn their back on the problem and deliberately fail to educate the public. Remedies for these corrosion problems have been available to the County of Nassau since 1977 when the EPA published a report entitled *Sewer Infiltration and Inflow Control Product and Equipment Guide* (EPA 600/2-77-017c), yet no action has been taken in over 40 years to address this problem which has resulted in cracked and broken buried pipes on private property in the County of Nassau.

16.      The County of Nassau has failed to maintain records of sewer lateral breaks, repairs, leaks, infiltration and exfiltration and has failed to educate the public, and these failures will cause County residents to bear the burden of expensive repairs, basement and property floods, and Clean Water Act fines that may bankrupt the County and its residents. Additionally, The County of Nassau has never taken any steps to examine the spur connection from the private property lateral to the main line. Spur connections are commonly broken, aging and cracked and are a significant cause of infiltration, exfiltration and contamination. Historically, spur connections were made by hammering the private sewer lateral into the main sewer line, and thus the seal at the main is broken, cracked and leaking raw sewage. The County must undertake a complete assessment of the condition of the spurs and take steps required by DEC regulations to make repairs.

17.      It is the requirement of government to put residents on notice of beach closures due to sanitary sewer overflows, but governments fail to educate the public as to the cause of those overflows. Residents are unaware as to the reason for beach closures beyond high bacteria levels, and the County of Nassau has failed to educate the public that those high bacteria levels are caused by treatment plant overflows caused by excess

flow to the treatment plants caused by infiltration into sewer laterals. The County of

Nassau must educate the public and not turn their back on the actual cause of sanitary

sewer overflows.

18.     Under Section 309(d) of the Clean Water Act, 33 USC § 1319(d), and 40 C.F.R.

19, each of the above-described violations subjects the violator to a penalty of up to

$37,500 per day.  In addition to civil penalties, we will seek injunctive relief under

Sections 505(a) and (d) of the Clean Water Act 33 USC § 1365(a) and (d), and such other

relief as is permitted by law.  Also, Section 505(d) of the Clean Water Act, 33 USC §

1365(d), permits prevailing parties to recover costs including attorney's fees.

19.     This citizen complaint seeks an order and judgment protecting the residents of the

COUNTY OF NASSAU communities along the Long Island Sound from ongoing harm,

ongoing violations and continued raw sewage contamination into the ground, the water

and the environment. The COUNTY OF NASSAU has neglected to enforce its

delegation of duties to UNITED WATER, and that delegation has led to neglect in the

oversight, enforcement and maintenance of the COUNTY OF NASSAU wastewater

treatment plants and neglect in required inspection and reports regarding the sewer

infrastructure under the control and responsibility of the COUNTY OF NASSAU.  Sewer

use fees paid to the COUNTY OF NASSAU by the residents of satellite collection

systems in the COUNTY OF NASSAU, such as the Villages of Freeport, Lawrence and

Garden City will rise dramatically if the COUNTY OF NASSAU does not take steps to

enforce its own sewer use ordinance, to require satellite collections systems to enforce

their sewer use ordinances, and to take required steps to reduce flow to the COUNTY OF

NASSAU wastewater treatment facilities to reduce excess flow so that the COUNTY OF

NASSAU is in compliance with DEC regulations requiring the COUNTY OF NASSAU

to take reasonable steps to reduce infiltration into the COUNTY'S collection system

causing SSO'S. Since the COUNTY OF NASSAU has turned its back on CWA

violations and regulations, it is the role of a citizen complainant as a private attorney

general to seek judicial intervention in an effort to protect the environment and to protect

residents from CWA fines that accrue daily, to residents and to the COUNTY OF

NASSAU.

20.    Nassau County maintains NPDES permit numbers NY0026450, NY0026859, and

NY0026620 for the Bay Park, Cedar Creek and Glen Cove Wastewater Treatment Plants,

respectively, pursuant to 33 U.S.C. § 1342(b). These permits allow the COUNTY OF

NASSAU to discharge limited and approved quantities of pollutants subject to

compliance with certain requirements. They also require the submission of regular reports

regarding the condition of the treatment plants and the characteristics of the discharges.

21.    Due to the substandard conditions at the COUNTY OF NASSAU treatment plant

in Glen Cove, the adjoining Hempstead Harbor is polluted and unsafe, and the COUNTY

OF NASSAU has been on notice of the violations and damaging discharges for years. A

Hempstead Harbor Report highlighted to the COUNTY OF NASSAU the dangerous and

damaging excessive discharges to the outfall pipe from the Glen Cove plant, and

environmental reports prepared for a waterfront residential development in Glen Cove on

Garvies Creek have further put the County on notice. Given the deplorable and dangerous

condition of the Hempstead Harbor due to the contaminants flowing from the Glen Cove

treatment plant, the COUNTY has been put on notice of the causes of sanitary sewer

overflows and over capacity conditions, but has chosen to turn its back on the dangers

caused by the contaminants. The COUNTY has failed to comply with DEC regulations requiring the reduction of infiltration into collection system laterals and pipes, has failed to educate the public regarding the aging condition of the COUNTY sewer infrastructure and has failed to provide Clean Water Act public education regarding the causes of sanitary sewer overflows that cause contamination such as that occurring at the COUNTY OF NASSAU wastewater treatment plants. The continued violations of the COUNTY's wastewater permits for the treatment plans plant have increased the potential for dangerous medical and biological conditions for fish, animals and humans using the Hempstead Harbor and the Long Island Sound, and, particularly, the new Garvies Point Development area where untreated outfall waste from the Glen Cove facility enter at incoming tides.

22.      The Nassau County Treatment Facilities have been in violation for years. Presently, Bay Park is in violation for Copper, Coliform and Chlorine level exceedences and Glen Cove is in violation for Fecal Coliform exceedences. Even worse, the Glen Cove required daily monitoring reports have not been filed as required since July 2018, and the COUNTY OF NASSAU has taken no action to file those reports timely, similar to the same issue that occurred in 2015 and 2016. The Cedar Creek Wastewater Treatment Plant has been in violation for excess coliform discharge for years. The COUNTY OF NASSAU has no defense to the allegations contained in Plaintiff's complaint regarding exceedences and failure to report since the COUNTY OF NASSAU admits violating their NPDES and SPDES permits based on their own reports filed with New York State and the EPA and available to the public on the EPA Echo website.

23.     The COUNTY OF NASSAU is strictly liable for NPDES and SPDES violations. Under the Clean Water Act, "compliance is a matter of strict liability and a defendant's intention to comply or good faith attempt to do so does not excuse a violation." *Upjohn Co.,* 660 F. Supp at 1409 (citing *United States v. Earth Sciences, Inc.,* 599 F.2d 368, 374 (10th Cir. 1979); *Connecticut Fund for the Env't v. Job Plating Co.,* 623 F. Supp 207, 218 (D. Conn. 1985)). The COUNTY OF NASSAU admits to violations of its permit by its own reporting, for example, of excess discharges of chlorine, coliform and copper.  Fecal coliform violations indicate the discharge of incompletely disinfected effluent and suggest the presence of other pathogenic bacteria and virus in the effluent. These discharges containing fecal coliform in excess of permit limits increases the Plaintiff's risk of exposure to disease causing organisms. Residents of Nassau County who drink water downstream of a sewage plant have standing to challenge what goes into their water.

24.     The COUNTY OF NASSAU has been on notice of the poor and aging condition of the private side of the COUNTY OF NASSAU collection system for years. The most recent notice occurred in 2015 with the service of a notice of claim in the within action. Much earlier, though, the COUNTY OF NASSAU was on notice of the condition of private property sewer laterals due to available reports published by the EPA and other organizations that describe in detail the declining condition of cast iron private property sewer laterals. In particular, the EPA technical report dated May 1991 cautioned that government inaction regarding the corrosive effects of Hydrogen Sulfate in private property and public wastewater pipes would lead to catastrophic events such as sewer pipe collapse and street collapse. (*Hydrogen Sulfide Corrosion: Its Consequences,*

*Detection and Control*, EPA Office of Water, September, 1991) This early study was correct; the most common failure of sewer laterals is cracking on the top of the buried sewer pipe which permits rainwater to infiltrate the collection system, causing excess flows and SSO's, and exfiltration of raw sewage into the surrounding ground, causing long term contamination of the sole source aquifer for Long Island drinking water. The COUNTY OF NASSAU must develop and implement a sewer line corrosion plan as part of a public education program.

25. The failure of the COUNTY OF NASSAU have caused sanitary sewer overflows to increase due to excess flow from sanitary sewer lines on private property and this data has been available to the COUNTY OF NASSAU by the DEC and EPA. Since the COUNTY OF NASSAU has neglected their legal obligation to reduce infiltration and educate the public, the rate of beach closures due to sanitary sewer overflows caused by infiltration during rain events has increased and still the COUNTY OF NASSAU continues to turn its back on the problem and deliberately fail to educate the public. Remedies for these corrosion problems have been available to the COUNTY OF NASSAU since 1977 when the EPA published a report entitled *Sewer Infiltration and Inflow Control Product and Equipment Guide* (EPA 600/2-77-017c), yet the COUNTY OF NASSAU has taken no action in over 40 years to address this problem which has resulted in cracked and broken buried pipes on private property in the COUNTY OF NASSAU and causes contamination and sanitary sewer overflows to occur regularly.

26. Homes in the COUNTY OF NASSAU average over 50 years, and their connections to the COUNTY OF NASSAU sewer collection system are also aging. EPA and other government reports confirm that the lifespan of a cast iron sewer pipe is

between 20 and 50 years. Thus, homes in the COUNTY OF NASSAU have sewer laterals that are well beyond their lifespan. This leads to breaks, leaks, cracks and a general breakdown in the condition of the pipe. The COUNTY OF NASSAU has been on notice of the lifespan of private property sewer laterals yet has chosen to address the condition of the public sewer collection system rather than the private side. The private side of the collection system makes up one-half of the entire collection system, so the COUNTY OF NASSAU has taken an illogical approach to reducing excess flows by contracting with UNITED WATER and by failing to educate the public and provide a program to inspect and repair sewer laterals that will be beyond the means of residents of the COUNTY OF NASSAU. The COUNTY OF NASSAU, by failing to enforce its own sewer use ordinance, and to require that satellite collection systems enforce their sewer use ordinances, the COUNTY OF NASSAU is leaving their residents in the dark while they spend millions on just the public side of the entire collection system. These same reports show that 70% of infiltration causing excess flows and SSO's are due to the private side sewer laterals, yet the COUNTY OF NASSAU has taken no steps to assist residents and to reduce infiltration.

27.     The COUNTY OF NASSAU has failed to maintain records of sewer lateral breaks, repairs, leaks, infiltration and exfiltration and has failed to educate the public, and these failures will cause COUNTY residents to bear the burden of expensive repairs, basement and property floods, and Clean Water Act fines that will bankrupt the COUNTY OF NASSAU and its residents.

28.     The COUNTY OF NASSAU has never updated its 1995 sewer use ordinance, which is now contradictory to local municipal ordinances and the responsibility of United

Water under the COUNTY OF NASSAU contract. For example, United Water is now responsible for the lateral from the curb to the mainline. However, under the sewer ordinance, the homeowner is responsible for the lateral from the curb to the mainline. While this may be a benefit to homeowners in the COUNTY, the COUNTY'S lack of public education causes confusion for homeowners and United Water during repair procedures.

29.     The COUNTY OF NASSAU has never taken any steps to examine the spur connection from the private property lateral to the main line. Spur connections are commonly broken, aging and cracked and are a significant cause of infiltration, exfiltration and contamination. Historically, spur connections were made by hammering the private sewer lateral into the main sewer line, and thus the seal at the main is broken, cracked and leaking raw sewage. The COUNTY OF NASSAU must undertake a complete assessment of the condition of the spurs and take steps required by DEC regulations to make repairs.

30.     The COUNTY OF NASSAU puts residents on notice of beach closures due to sanitary sewer overflows, but fails to educate the public as to the cause of those overflows. Residents are unaware as to the reason for beach closures beyond high bacteria levels, and the COUNTY OF NASSAU has failed to educate the public that those high bacteria levels are caused by treatment plant overflows caused by excess flow to the treatment plants caused by infiltration into sewer laterals. The COUNTY OF NASSAU must educate the public and not turn their back on the actual cause of SSO's.

31.     The COUNTY OF NASSAU has been able to avoid numerous EPA and DEC legal actions and resulting consent decrees and thus the COUNTY OF NASSAU has

been able to continue its neglect and leaving the responsibility for subsequent elected governments. However, when the EPA and the DEC initiate an action against the COUNTY OF NASSAU, that action will cost the COUNTY OF NASSAU amounts of money beyond their ability to afford and the fines imposed will bankrupt the COUNTY OF NASSAU and their resident taxpayers. Consent decrees state that the essential problem in municipalities facing consent decrees is too much water flowing to wastewater treatment plants in wet weather, a problem that occurs with every rain event in the COUNTY OF NASSAU. A recent consent decree in the State of Tennessee addressed this problem, comparing a normal load at a wastewater treatment plant to the capacity of that plant, and concluding that the amount of flow was millions of gallons of sewage in excess of the capacity; that the excess overflows rise up through manholes or spills at outfalls, dumping waste-contaminated water onto streets and yards, creeks and the river from which Chattanooga residents drink. The consent decree cited a 3 month period for which Chattanooga's required quarterly report to the EPA noted 43 sewer overflows and 60 outfall discharges totaling tens of millions of gallons. In response, the Tennessee Riverkeeper commented that lax waste treatment is a problem across Tennessee and local governments haven't willingly stepped up with solutions. "Tennessee Riverkeeper continues to find illegal sewage discharges, public health threats that are enabled by the failure of government agencies and their leaders. Many of the dirtiest sewage treatment facilities across Tennessee have been in violation of the Clean Water Act for over 5 years, often enabled by weak enforcement actions from [TDEC]. ..It is the 21st century. Tennesseans deserve the reasonable expectation that human waste will be treated safely."

32.     EPA and DEC consent decrees requiring public education, POTW flow reduction, and private sewer lateral programs to assist residents, reduce the amount of SSO's by increasingly large amounts. As an example, after a 5-year program in the City of Long Beach, New York, the City reported a 20% reduction in flow to the City's wastewater treatment facility.  Reductions in flow to wastewater treatment facilities save municipalities funds for operation and maintenance for the facility and the collection system, prevent sanitary sewer overflows, reduce sewer use fees, prevent contamination, and avoid EPA and DEC fees and consent decrees that cost millions of dollars in taxpayers funds.

33.     The EPA issued a report on the importance of maintaining private property sewer laterals in a June, 2014 report that emphasized the importance that private property sewer laterals have on municipal sewer collection systems. (EPA, Private Sewer Laterals, June, 2014) That report stated that the condition of sewer laterals can affect the results of sewer system rehabilitation programs, particularly those programs investigating and addressing capacity and inflow and infiltration issues. The report stated that "typically, private laterals make up about half of the total length of a sewer system. Even when the system-wide impact of infiltration is not an issue, defective laterals can cause sewer backups, and can be an important issue of concern in public works agencies. The owners of the laterals may be unaware of these problems or unwilling to fix them if the consequences do not directly affect them." This is the problem that the COUNTY OF NASSAU hides from, knowing that private property laterals in the COUNTY OF NASSAU are old, outdated, beyond their lifespan and commonly broken cracked and damaged, yet being reluctant to educate their residents because, as the EPA Report states, "Frequently it is because the

buried sewer laterals that are presenting a problem to the municipality are not causing an obvious problem to the owners of the laterals.  This makes dealing with private property owners over sewer lateral repairs a difficult issue. Most private property owners have no idea of the condition of their sewer laterals and they will see little or no direct personal benefit from the cost to repair their lateral." This is the problem caused by the COUNTY OF NASSAU's neglect; knowing that the problem exists but taking no action to remedy the problem although DEC regulations require action. This action seeks penalties, fines and orders against the COUNTY OF NASSAU to require immediate action, specifically to assist unknowing property owners to understand the issue of leaking, cracked and broken buried sewer laterals and to take action to assist property owners in inspecting, repairing and replacing sewer laterals with public education and repair programs that will ultimately reduce excess infiltration in the COUNTY OF NASSAU sewer collection system eliminating sanitary sewer overflows, beach closures, contamination and environmental damage.

## JURISDICTION, VENUE, NOTICE, AND AUTHORITY

34.    This Court has jurisdiction over the subject matter of this action pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), and 28 U.S.C. §§ 1331, 1345 and 1355.

35.    Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) and Section 309(b) of the CWA, 33 U.S.C. § 1319(b), because it is the judicial district where the COUNTY OF NASSAU is located and where the alleged violations occurred.

36.     Notice of the commencement of this action has been given to the COUNTY OF

NASSAU in accordance with Section 309(b) of the CWA, 33 U.S.C. § 1319(b), by the

filing of a 60-Day Notice served on COUNTY OF NASSAU on the 22nd day of

September 2015. The COUNTY OF NASSAU failed to resolve this action during the 60-

day period to enter a settlement of this matter to avoid litigation and thus all conditions

precedent to the commencement of this action have been satisfied.

37.     Authority to bring this action is vested and authorized in sections 505 and 506 of

the CWA, 33 U.S.C. § 1365,1366 and 28 U.S.C. §§ 516 and 519:

> Plaintiff has standing to bring this case. For purposes of standing under 33
> U.S.C. § 1365(g), a citizen is a "person or persons having an interest which is or
> may be adversely affected." Defendants' chronic NPDES permit violations
> cause pollution that is harmful to the Plaintiff. This harm satisfies the injury-in-
> fact requirement defined by *Sierra Club v. Morton*, 405 U.S. 727 (1972).

## STATEMENT of the FACTS

38.     This action is brought by citizen complainant ROBERT VITIELLO to require the

Defendant COUNTY OF NASSAU to take all measures possible to fulfill the objectives

of the CWA and to achieve and maintain compliance with the National Pollutant

Discharge Elimination System (NPDES), the requirements of the CWA and all applicable

Federal, State and local regulations. In order to cause the Defendant COUNTY OF

NASSAU to comply with the CWA, Plaintiff ROBERT VITIELLO seeks the imposition

of civil penalties against COUNTY OF NASSAU and additional penalties if the

COUNTY OF NASSAU does not reach compliance. Since the COUNTY OF NASSAU

has been out of compliance with EPA and DEC requirements for years for its' wastewater

treatment plants, failure to file required permit reports, sanitary sewer overflows and its

failure to educate the public and take steps to reduce infiltration, all continuing to date,

the Plaintiff seeks statutory penalties to be imposed against the COUNTY OF NASSAU.

It is respectfully requested that the Court issue fines and penalties pursuant to the CWA

against the COUNTY OF NASSAU. The total amount of fines to be imposed against the

County of Nassau, from the notice date of September 22, 2015 to present, are in the

amount of $51,570 per day for each violation until January 14, 2017, and $52,414 per day

for each violation subsequent to January 14, 2017, pursuant to Section 309 of the Clean

Water Act, 33 U.S.C. 1319(d) and the Federal Civil Penalties Inflation Adjustment Act of

1990, for a total fine of Fifty Seven Million, Seven Hundred Seventy Four Thousand

($57,774,420.00) Dollars. For the residents of the COUNTY OF NASSAU who have

failed to maintain their private property sewer lines that are connected to the COUNTY

OF NASSAU sewer system, Plaintiff seeks statutory fines in the amount of $35,000 per

day together with the increased fines by statute, for each day the individual resident failed

to inspect, repair and replace outdated sewer lines and has been in violation of the sewer

use ordinance of the COUNTY OF NASSAU.  Since the COUNTY OF NASSAU has

failed to educate the public regarding all aspects of private property sewer lines,

including exfiltration, infiltration and intrusion, the importance of inspecting those lines,

fixing those pipes, and repairing those pipes, as well as the lifespan of private sewer lines

of 20 to 50 years, the Plaintiff seeks the imposition of a public education program as well

as the imposition of fines. The Plaintiff seeks to cause the COUNTY OF NASSAU to

comply with the intention of Congress over Forty (40) years ago, in 1972, to require

municipalities and authorities to ensure that sewer systems are properly built, maintained

and regulated so that contamination of water bodies and groundwater would not occur.

The intention of the CWA was to completely eliminate the discharge of pollutants into

navigable waters by 1985. This intention was to be implemented by: management plans

to assure control of pollution sources; research efforts to develop technology necessary to

eliminate pollutant discharges; and the control of point source and non-point source

discharges of pollutants. The initial deadline for governments to upgrade and regulate

sewer systems without contamination and spills was 1985. However, many municipalities

and authorities missed the deadline, by failing to examine and regulate their sewer

systems; by failing to report spills and leaks from sewer systems into navigable waters,

aquifers and groundwater; by failing to enforce laws, rules and regulations enacted to

penalize polluters; by failing to educate the public about sewer system upgrades, leaks

and maintenance to prevent contamination; by failing to evaluate, upgrade, enhance,

maintain, regulate and properly utilize sewer systems to avoid SSO's; by failing to

eliminate infiltration of private and public sewer laterals; and by failing to monitor and

remedy public and private sewer lines that were and are corroded and leaking. These

failures have caused leaks, intrusion and overflows of sewer systems, which, in turn, have

caused, and continue to cause, contamination of waterways, bays, beaches, streams,

streets, basements and groundwater, including aquifers.

39.     The current operating status of the COUNTY OF NASSAU'S Glen Cove

wastewater treatment facility is maintained on the EPA sponsored Enforcement and

Compliance History Online ("ECHO") website. Without the necessity of obtaining

documents through the filing of the FOIL request, the ECHO site shows that the

COUNTY OF NASSAU is currently in non-compliance with the CWA regarding

pollutants discharged from the Glen Cove and Bay Park sewage treatment plants and the

outright failure of the COUNTY OF NASSAU and its agents and assignors, UNITED

WATER, and SEVERN TRENT, the prior manager of the plant, to file required

compliance reports and to properly inspect, maintain and manage these wastewater

treatment plants.

40.     This lawsuit is necessary due to the COUNTY OF NASSAU'S failures in

implementing and complying with the CWA and because of a lack of record keeping and

reporting by the COUNTY OF NASSAU. Insufficient record keeping, compliance

failures and maintenance has put not only the citizens of the COUNTY OF NASSAU in

violation of the CWA, but has exposed all citizen users of waters surrounding and

adjacent to the COUNTY OF NASSAU to high Mercury levels, as well as illicit

discharges to groundwater and aquifers, as the result of broken, cracked and leaking

sewer lines and laterals as part of the COUNTY OF NASSAU sewer system. Mercury is

a neurotoxin that can have serious detrimental health issues to humans and animals. Fish

are exposed to high Mercury levels in the Long Island Sound. Exposure to human beings

most commonly occurs when people eat fish and shellfish that have high levels of

mercury in their tissues. In high doses, some forms of mercury have caused increases in

several types of tumors in rats and mice. (EPA, *Health Effects of Exposure to Mercury*,

updated January 15, 2016)

41.     There are no current or future plans to correct these deficiencies by the COUNTY

OF NASSAU and thus citizen complainant ROBERT VITIELLO seeks court

intervention to enforce applicable laws, rules, regulations and statutes. Court intervention

is urgent due to the complete lack of the COUNTY OF NASSAU to comply with the

Clean Water Act, the EPA and DEC regulations and laws, the laws of the State of New

York and the Nassau County Sewer Use Ordinance.

42.     The COUNTY OF NASSAU failed to oversee, monitor or seek compliance with its contract with private operator SEVERN TRENT for its municipal sewage treatment facility. While under contract with SEVERN TRENT for the operation of the GLEN COVE wastewater treatment facility, the COUNTY OF NASSAU had a non-delegable duty and obligation to ensure and enforce compliance with the CWA both at the GLEN COVE wastewater treatment facility and in the entire county sewer collection system. However, the COUNTY OF NASSAU never enforced its contract rights with SEVERN TRENT to protect its citizens from contract breaches for illegal discharges causing high Carbonaceous Oxygen Demands ("COD") levels, high Mercury levels and high suspended solids levels as well as creating nitrogen loading in the Long Island Sound. The COUNTY OF NASSAU has taken the position that since ownership of the GLEN COVE wastewater treatment plant, and the SEVERN TRENT contract for operation of the GLEN COVE wastewater treatment plant was transferred to UNITED WATER, the COUNTY OF NASSAU is permitted to absolve itself of mandated obligations under the CWA. This position by the COUNTY OF NASSAU is dangerous, neglectful, incorrect and inapposite to the legal requirements of the COUNTY OF NASSAU.

**RELEVANT FACTUAL HISTORY**

43.     In 1999, GLEN COVE was faced with lawsuits by the New York State Department of Environmental Conservation ("DEC") under consent numbers R1-3821-89-10 and 1-5879. The consent decrees were related to GLEN COVE'S failure to comply with the CWA related to its wastewater treatment plant and its wastewater collection system. As the result of those decrees, GLEN COVE entered a contract with SEVERN

TRENT, a private operator of wastewater and sewer systems, for the operation and management of the GLEN COVE sewer system including its wastewater treatment facility and sewer lines and laterals. ("SEVERN TRENT CONTRACT").  Under the terms of that contract, SEVERN TRENT agreed to comply with all CWA rules and regulations including the oversight and control of effluent discharged by the plant. GLEN COVE was responsible under the term of the contract to administer the GLEN COVE sewer use ordinance and to pay to SEVERN TRENT sewer use fees generated from GLEN COVE residents utilizing the GLEN COVE sewer system for the discharge of effluent and the treatment of sewage from the collection system.

44.     The SEVERN TRENT contract with GLEN COVE was amended from time to time and, upon information and belief, that contract is still in effect.

45.     On January 8, 2008, GLEN COVE entered a contract with the COUNTY OF NASSAU for a sewer consolidation. ("CONSOLIDATION AGREEMENT").  Under the terms of that contract, the SEVERN TRENT contract of 1999, as aforesaid, between SEVERN TRENT and GLEN COVE, was assigned to the COUNTY OF NASSAU.  That contract was approved by the NASSAU INTERIM FINANCE AGENCY ("NIFA"). The COUNTY OF NASSAU assumed responsibility for the GLEN COVE sewer collection system and the SEVERN TRENT contract. The consolidation agreement was for the entire GLEN COVE sewer and collection system, including the GLEN COVE sewage collection and wastewater treatment facility as defined in the SEVERN TRENT contract with GLEN COVE and the GLEN COVE wastewater treatment plant.

46.     On September 27, 2012, GLEN COVE entered a further consent decree with the DEC under index no. RCRA-02-2011-7506.

47.     GLEN COVE and SEVERN TRENT agreed in the contract that they would

comply with all CWA laws and regulations. However, the contract did not address

compliance with the GLEN COVE sewer ordinance, the condition and maintenance of

private and municipal sewer lines and laterals, and the responsibility for statutory fines

and penalties under the CWA.  SEVERN TRENT agreed in the contract to maintain,

operate, repair and improve the GLEN COVE sewer system so as to be capable of

providing sewerage services in compliance with the contract and all applicable laws.  The

parties to the contract, GLEN COVE and SEVERN TRENT, agreed to comply with all

applicable Federal, State and local laws.

48.     On January 1, 2015, the COUNTY OF NASSAU and UNITED WATER entered

a contract. ("UNITED WATER CONTRACT").  Under the terms of that contract,

UNITED WATER agreed to operate the COUNTY OF NASSAU sewage treatment

plants and the COUNTY OF NASSAU sewer collection system, and further agreed to

manage the GLEN COVE sewer collection system and wastewater treatment facility

under the terms of the SEVERN TRENT CONTRACT. However, the UNITED WATER

CONTRACT defined the sewer collection system as including sewer lines and laterals up

to the curb, and not extending onto private property. This definition of the sewer

collection system was different from the SEVERN TRENT definition, as contained in the

SEVERN TRENT CONTRACT, which did not limit the sewer system up to the curb line.

49.     Since July 1, 2014, the COUNTY OF NASSAU plant has been violating its

operating permit at the GLEN COVE wastewater treatment facility for non-reporting and

high discharge and pollutant levels. These levels are from Carbonaceous Oxygen

Demands ("COD") of 999%, Mercury of 300% and Suspended Solids at 999%. The

COUNTY OF NASSAU remains in non-compliance for over 7 of the last 13 reporting

quarters and thus the COUNTY OF NASSAU has been out of compliance since July 1,

2014. SEVERN TRENT continues to be responsible as a contract vendee under the terms

of the UNITED WATER CONTRACT for operating the GLEN COVE wastewater

treatment facility in conformance with CWA requirements. UNITED WATER continues

to be responsible as a contract vendee under the terms of the UNITED WATER

CONTRACT for managing the operation of the GLEN COVE wastewater treatment

facility under the terms of the UNITED WATER CONTRACT.


## PARTIES

50.     Plaintiff ROBERT VITIELLO is a "private attorney general" in this action.

ROBERT VITIELLO is bringing this lawsuit to stop illegal pollution discharges,

pursuant to the Clean Water Act. ROBERT VITIELLO utilizes the waters in and adjacent

to the COUNTY OF NASSAU for recreation and swimming, as well as the navigable

waters, and beaches, in the COUNTY OF NASSAU and its vicinity.

51.     Section 504(a) of the CWA, 33 U.S.C.  § 1364(a), provides that notwithstanding

any other provision of this chapter, a private citizen upon receipt of evidence that a

pollution source or combination of sources is presenting an imminent and substantial

endangerment to the health of persons ... may bring suit on behalf of the United States ...

to immediately restrain any person causing or contributing to the alleged pollution to stop

the discharge of pollutants causing or contributing to such pollution or to take such other

action as may be necessary."

52.     Citizen suits under the CWA allow for civil penalties as defined in 33 U.S.C. §

1319(d), which, in conjunction with 40 C.F.R. § 19.4 (which adjusts the amount for

inflation), permits a court to impose civil penalties not to exceed $37,500 per day per

violation of, inter alia, 33 U.S.C. § 1311. For violations on and before January 12, 2009,

the limit is $32,500 per day per violation.

53.     Defendant COUNTY OF NASSAU is a municipality organized and existing

under the laws and the Constitution of the State of New York with the power to sue and

be sued. The COUNTY OF NASSAU GLEN COVE wastewater treatment facility, as

well as the CEDAR CREEK water pollution control plant and the BAY PARK sewage

treatment plant, are located in the COUNTY OF NASSAU and are owned by the

COUNTY OF NASSAU.  These facilities are Publicly Owned Treatment Works

("POTW") as defined by 6 NYCRR § 750-1.2(68). Pursuant to Section 402 of the Clean

Water Act ("CWA"), operators of small municipal separate storm sewer systems located

in urbanized areas and those additionally designated by New York State are unlawful

unless they are authorized by a National Pollutant Discharge Elimination System permit

("NPDES") or by a state permit program. New York's State Pollutant Discharge

Elimination System ("SPDES") is an NPDES-approved program with permits issued in

accordance with the Environmental Conservation Law ("ECL"). The GLEN COVE

wastewater treatment plant operates under NPDES Permit NY0026620 that was issued in

1990. These plants processes sewage, sludge and wastewater generated from the

COUNTY OF NASSAU sewer system, and the overall wastewater flow to the plants if

from the COUNTY OF NASSAU sewer collection system generated within the

COUNTY OF NASSAU.  The Plants process only wastewater and sewage, which is

acceptable under the COUNTY OF NASSAU sewer use ordinance, which includes all wastewater from public and private sewer lines and laterals in the COUNTY OF NASSAU.

54.    The COUNTY OF NASSAU is a "person" within the meaning of Section 502(5) of the CWA, 33 U.S.C. § 1362(5), and a "municipality" within the meaning of Section 502(4) of the CWA, 33 U.S.C. § 1362(4).

55.    The COUNTY OF NASSAU is responsible for the enforcement of the laws regulating sewer systems serving residential, commercial and industrial entities throughout the COUNTY OF NASSAU, State of New York.  This responsibility is non-delegable.

56.    Plaintiff ROBERT VITIELLO uses and enjoys the waters of the Long Island Sound and the waters surrounding and adjacent to the COUNTY OF NASSAU and thus has standing pursuant to the CWA. Plaintiff has curtailed his use of the bodies of water in and around the COUNTY OF NASSAU due to the COUNTY OF NASSAU'S lack of CWA compliance, the diminishment of the COUNTY OF NASSAU aesthetic and recreational areas, the routine and regular beach closings, the water conditions, the floating sewage in the water, and the overall diminished water quality caused by the COUNTY OF NASSAU'S failure to comply with CWA requirements.

## RELEVANT HISTORY OF THE CWA

57.    Studies dating back to the time period of the Clean Water Act have shown that the environment of the Long Island Sound and the Great South Bay is unique. The Long Island Sound and the Great South Bay contain sensitive bays, tributaries, streams, rivers,

waterways, ponds and lakes. Many communities in shore communities around Long

Island Sound and the Great South Bay rely on these water bodies for economic,

recreational and residential activities. These studies have demonstrated that the

sensitivities of the Long Island Sound and the Great South Bay require great attention and

concern to preserve the integrity of these resources.

58.     The Inhabitants of Long Island are completely dependent on groundwater and

aquifers for their freshwater needs.  Aquifers gain precipitation by infiltration though soil.

The COUNTY OF NASSAU is adjacent to salt water in the Long Island Sound and the

Great South Bay, and close to fresh water in the Hudson River. These are the soils that

surround private and municipal sewer lines and laterals, and that are adjacent to the

discharge of effluent from wastewater treatment plants, in the COUNTY OF NASSAU.

59.     Since the enactment of the CWA Biologists and conservation groups have

identified specific causes of groundwater, aquifer and waterway contamination in the

Long Island Sound and on Long Island. These causes include storm water runoff,

unlawful discharges from wastewater treatment plants, public sewer lateral leaks, private

sewer lateral leaks, overflow of sewer systems, stray electric current corrosion of sewer

laterals, and leaking and broken private sewer laterals caused by age, damage and the

introduction of chemicals to household sewer systems. These water contaminants cause

damage to sensitive ecosystems, including nitrogen loading and brown tide. Sewage

treatment plants have multiple effects on nutrient levels in the water bodies that untreated

sewage and effluent flow into. These effects on nutrient levels can have significant

effects on the biological life in the water in contact with untreated effluent discharges.

Studies have found high nutrient concentrations are directly linked to sewage effluents.

High nutrient concentration leads to high chlorophyll, a concentration that is a proxy for primary production in marine environments. High primary production means high phytoplankton populations. Simply put, effluent released into marine systems leads to greater marine population instability.

60.    The result of water contamination is beach closings; the altering of biological and marine systems; pollution of water bodies, destruction of groundwater and aquifers; and long-term destruction of sensitive marine populations. Sensitive estuaries and preserves cannot survive the result of contamination and the destruction of fish, plants and other lives in the water. These results are devastating to the Long Island Sound, the Great South Bay, Long Island, and the COUNTY OF NASSAU, its citizens, lands and life.

61.    Water contamination destroys the Long Island Sound and Great South Bay ecosystems. Efforts to restore Long Island Sound and the Great South Bay to a positive ecological body have been diminished due to the COUNTY OF NASSAU'S failure to comply with the CWA and failure to take steps to prevent contamination caused by SSO'S and I & I. Water quality problems prevent short term and long term fixes.

62.    Municipalities and authorities in the United States have taken steps to prevent water contamination. These entities have enforced government CWA enforcement provisions, from financial penalties to enforcement proceedings. Many entities have educated their residents regarding private sewer lateral maintenance and laws requiring the inspection and replacement of damaged, leaking and outdated lateral sewer lines. Most entities have enacted local regulations, with reporting, monitoring and enforcement provisions. Since the EPA has determined that failing and leaking private sewer laterals are responsible for the highest percentage of I & I in sewer systems, municipalities have

taken important measures to remedy leaking and failing laterals. These municipalities have recognized the need for controlling sewer lateral conditions so that infiltration of rain water and ground water into those laterals do not result in an increase in the flow to the wastewater treatment plant, which in turn cause sanitary sewer overflows, which cause beach closings and contamination of raw and untreated sewage.

63.     The COUNTY OF NASSAU has failed to control the overflow of untreated sewage into navigable waters surrounding the COUNTY OF NASSAU. The COUNTY OF NASSAU has an outdated sewage system that is deteriorated. With residences within the COUNTY OF NASSAU municipal sewer system averaging older than Fifty (50) years, buried sewer laterals connecting residences to the municipal sewer mains are b beyond their lifespan. The condition of these laterals has, and continues to be, unchecked. Broken and leaking sewer laterals are only found upon a homeowner discovery, commonly a puddle in the front yard of the residence. Ordinances enforcing the repair and maintenance of private property sewer laterals are not enforced. This deteriorated system includes public and private laterals with structural defects. The system is composed of old pipes and manhole covers, which allow unwanted storm water and lateral infiltration and inflow to overload the COUNTY OF NASSAU sewer system. While the COUNTY OF NASSAU can obtain systems and replacement items to ensure and maintain outdated system infrastructure, the COUNTY OF NASSAU has made no effort to seek CWA compliance. When these underground sewer laterals are overloaded with unwanted I & I, SSO'S result and the sewage overflows into water bodies and groundwater. The COUNTY OF NASSAU has failed to understand this problem and has failed to take remedial steps to resolve the problems caused by these issues. The

COUNTY OF NASSAU has not maintained proper records and has failed to make public documents that provide an overview of the COUNTY OF NASSAU sewer collection system, including records utilized as the basis for recommending to NIFA. NIFA relied on documents from the COUNTY OF NASSAU when voting to approve the UNITED WATER CONTRACT, but those records have been sealed.

64.    The COUNTY OF NASSAU is required to comply with the CWA by educating its residents about I & I and by assisting residents to comply with the COUNTY OF NASSAU sewer use ordinance, at the very least. The COUNTY OF NASSAU has failed to initiate a public education program for its residents, has failed to update its current sewer use ordinance to require compliance with the CWA and has failed to assist its residents by offering a loan program or a repair program for the repair of private property sewer laterals or a program designed to comply with all of the CWA requirements referred to in this complaint.

65.    The COUNTY OF NASSAU is deficient in failing to maintain records regarding its compliance with its sewer use ordinance, and for failing to mandate compliance with its permits and obligations for the operation of the COUNTY OF NASSAU wastewater treatment plant for compliance reporting and record keeping.

## RELEVANT STATUTORY OVERVIEW

66.    Section 502(12) of the CWA, 33 U.S.C. § 1362(12), defines the term "discharge of pollutants" to include "any addition of any pollutant to navigable waters from any point source."

67.    Section 502(6) of the CWA, 33 U.S.C. § 1362(6), defines the term "pollutant" to

include, inter alia, "sewage . . . , biological materials . . . , and . . . municipal . . . waste discharged into water."

68.     Section 502(7) of the CWA, 33 U.S.C. § 1362(7), defines the term "navigable waters" as "the waters of the United States, including the territorial seas."

69.     Part 122 of Title 40 of the Code of Federal Regulations, promulgated under the CWA to regulate the National Pollution Discharge Elimination System ("NPDES") permit program, defines "waters of the United States" to include, in relevant part, "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide," and tributaries to such waters.  40 C.F.R. § 122.2(a) and (e).

70.     Section 502(14) of the CWA, 33 U.S.C. § 1362(14), defines the term "point source" to include "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit . . . from which pollutants are or may be discharged."

71.     Section 402 of the CWA, 33 U.S.C. § 1342, provides that the Administrator may issue permits under the NPDES program for the discharge of pollutants into navigable waters of the United States upon such specific terms and conditions as the Administrator may prescribe.

72.     Pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), on November 16, 1990, the EPA promulgated regulations at 40 C.F.R. § 122.26(d) that set forth NPDES permit requirements to address discharges from large and medium treatment facilities and point sources.

73.     The CWA is a comprehensive statute designed "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve that goal, Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the "discharge of pollutants" except as in compliance with an NPDES permit issued by the EPA or an authorized state pursuant to Section 402 of the CWA, 33 U.S.C. § 1342. The CWA was established for the restoration and maintenance of chemical, physical and biological integrity of Nation's water and the elimination of pollutant discharges into navigable waters by 1985.

74.     The CWA defines the phrase "discharge of pollutants" to include "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). The CWA requires that all point source discharges to obtain a pollution control permit.

75.     Federal regulations promulgated pursuant to the CWA define the phrase "waters of the United States" to include, among other things, (1) all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide; (ii) all interstate waters; (iii) tributaries of these waters of the United States; and (iv) wetlands adjacent to the foregoing waters. 40 C.F.R. § 122.2.

76.     "Pollutant" within the meaning of the CWA includes ... solid waste ... sewage, garbage, sewage sludge ... biological materials ... and ... industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6).

77.     New York Codes, Rules and Regulations, contained in 6 NYCRR § 701, prohibits the discharge of sewage, industrial waste and other wastes that cause impairment of the best usages of the receiving waters.

78.     Section 301 of the CWA prohibits a point source discharge into waters of the United States, including the Long Island Sound and the Great South Bay. The CWA requires treatment of pollutants to a degree that will comply with established water quality standards. The CWA defines the term "point source" to mean "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit ... from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).  Point source discharges that are not permitted are illegal. Section 301 of the CWA prohibits a point source discharge of pollutants into water bodies without a NPDES permit.

79.     Section 402(a) of the CWA, 33 U.S.C. § 1342(a), establishes the NPDES permit system, and authorizes the EPA to issue permits for the discharge of pollutants, but only in compliance with Section 301 of the CWA, 33 U.S.C. § 1311, and such other conditions as the EPA determines are necessary to carry out the provisions of the CWA.

80.     The State of New York has been and continues to be authorized by the Administrator of the EPA to implement the NPDES permit program for discharges into navigable waters within its jurisdiction pursuant to Section 402(b) of the CWA, 33 U.S.C. § 1342(b).

81.     Section 308(a) of the CWA, 33 U.S.C. § 1318(a), states: "Whenever required to carry out the objective of this chapter, including but not limited to (1) developing or assisting development of any effluent limitation, or other limitation, prohibition, or effluent standard, pretreatment standard, or standard of performance under this chapter ... (3) any requirement established under this section; or (4) carrying out section ... 1342 [NPDES program] ... of this title 4 (A) the Administrator shall require the owner or

operator of any point source to: (I) establish and maintain such records, (ii) make such

reports ... and (v) provide such other information as he may reasonably require."

82.     Section 309(b) of the CWA, 33 U.S.C. § 1319(b), authorizes the EPA to

commence a civil action for appropriate relief, including a permanent or temporary

injunction, when any person violates, inter alia, Sections 301 or 308 of the CWA, 33

U.S.C. §§ 1311 or 1318, or violates any permit condition or limitation implementing such

sections in a NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §

1342.

83.     Section 309(d) of the CWA, 33 U.S.C. § 319(d), provides that any person who

violates Sections 301 and 308 of the CWA, 33 U.S.C. §§ 1311 and 1318, or violates any

permit condition or limitation implementing such sections in a NPDES permit issued

pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, shall be subject to a civil penalty

not to exceed $27,500 per day for each violation occurring between January 30, 1997 and

March 15, 2004; $32,500 per day for each violation occurring between March 16,2004,

and January 12, 2009; and $37,500 per day for each violation occurring after January 12,

2009, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L.

No. 101-410, § 4, 104 Stat. 890 (1990), 28 U.S.C. § 2461 note (as amended). See also

40 C.F.R. § 19.4.

84.     The NYSDEC has jurisdiction to protect the waters of the State pursuant to the

Environmental Conservation Law ("ECL"), Article 17, and the State's SPDES permit

program. ECL § 17-0511 states that "the use of existing or new outlets or point sources,

which discharge sewage, industrial waste or other wastes into waters of this state is

prohibited unless such use is in compliance with all standards, criteria, limitations, rules

and regulations promulgated or applied by the department pursuant to this article." Thus, it is a violation of the ECL Article 17 to discharge pollutants without obtaining a permit in accordance with CWA Section 402, 33 U.S.C. § 1342 , or the ECL Article 17.

85.     ECL § 71-1929 provides that any person who violates any provision of Titles 1 through 11 inclusive and title 19 of Article 17 of the ECL or any rule or regulation, order or determination of the NYSDEC Commissioner promulgated thereunder shall be liable for a civil penalty of up to Thirty Seven Thousand Five Hundred Dollars ($37,500). Injunctive relief is also available.

86.     New York State has issued regulations, under 6 NYCRR Part 750, that provide for "Obtaining A SPDES Permit" and "Operating In Accordance With A SPDES Permit." 6 NYCRR § 750-1.2(17) defines the term "bypass" to mean "the intentional or unintentional diversion of wastewater or storm water around any portion of a treatment facility having the effect of reducing the degree of treatment designed for the bypassed portion of the treatment facility."

87.     6 NYCRR § 750-1.2(26) defines the term "discharge" to mean "any addition of any pollutant to waters of the State through an outlet or point source."

88.     6 NYCRR § 750-1.2(28) defines the term "Discharge Monitoring Report" (DMR) to mean "a report submitted by a permittee to the department summarizing the effluent monitoring results obtained by the permittee over periods of time as specified in the SPDES permit."

89.     6 NYCRR § 750-1.2(45) defines the term "infiltration" to mean "water other than wastewater that enters a sewerage system (including sewer service connections) from the

ground through such means as defective pipes, pipe joints, connections, or manholes. Infiltration does not include and is distinguished from inflow."

90.     6 NYCRR § 750-1.2(46) defines the term "inflow" to mean "water other than wastewater that enters a sewerage system (including sewer service connections) from sources such as roof leaders, cellar drains, yard drains, area drains, foundation drains, drains from springs and swampy areas, manhole covers, cross connections between storm sewers, process and sanitary sewers, catch basins, cooling towers, storm waters, surface runoff, street wash waters, or drainage. Inflow does not include, and is distinguished from infiltration."

91.     6 NYCRR § 750-1.2(51) defines the term "Municipality" to mean "any county, town, city, village, district corporation, special improvement district, sewer authority or agency thereof."

92.     6 NYCRR § 750-1.2(52) defines the term "Municipal Sewage" to mean "wastewater composed primarily of discharges of sanitary sewage from residences, primarily from facilities not owned by a municipality, with or without the admixture of industrial wastewater."

93.     6 NYCRR § 750-1.2(58) defines the term "outfall" to mean "the terminus of a sewer system, or the point of emergence of any waterborne sewage, industrial waste or other wastes or the effluent there from, into the waters of the state."

94.     6 NYCRR § 750-1.2(59) defines the term "outlet" to mean outfall.

95.     6 NYCRR § 750-1.2(61) defines the term "partially treated" to mean "receiving some level of treatment, but not enough treatment to meet all effluent limits."

96.     6 NYCRR § 750-1.2(63) defines the term "permittee" to mean "the holder of a

SPDES permit."

97.     6 NYCRR § 750-1.2(64) defines the term "person or persons" to mean "any

individual, public or private corporation, political subdivision, government agency,

municipality, partnership, association, firm, trust, estate or any other legal entity

whatsoever."

98.     6 NYCRR § 750-1.2(68) defines the term "Publicly owned treatment works"

(POTW) to mean "any device or system used in the treatment (including recycling and

reclamation) of municipal sewage that is owned by a municipality. This definition

includes sewers, pipes, or other conveyances only if they convey wastewater to a POTW

providing treatment."

99.     6 NYCRR § 750-1.2(77) defines the term "sewage" to mean "the water-carried

human or animal wastes from residences, buildings, industrial establishments or other

places, together with such groundwater infiltration and surface water as may be present."

100.    6 NYCRR § 750-1.2(78) defines the term "Sewage Treatment Works" to mean "a

facility for the purpose of treating, neutralizing or stabilizing sewage, including treatment

or disposal plants, the necessary collection, intercepting, outfall and outlet sewers,

pumping stations integral to such plants or sewers, equipment and furnishings thereof and

their appurtenances."

101.    6 NYCRR § 750-1.2(81) defines the term "Sewer system" to mean "pipe lines or

conduits, pumping stations, force mains, and all other constructions, devices, and

appliances appurtenant thereto, used for conducting storm water, sewage, industrial waste

or other wastes, alone or in combination to a disposal system."

102.   6 NYCRR § 750-1.2(94) defines the term "upset" to mean "an exceptional incident in which there is unintentional and temporary noncompliance with permit effluent limitations because of factors beyond the reasonable control of the permittee. An upset does not include noncompliance to the extent caused by operational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventive maintenance, failure to properly monitor the system or careless or improper operation."

103.   6 NYCRR § 750-1.2(95) defines the term "wastewater" to mean "water that is not storm water, is contaminated with pollutants and is or will be discarded."

104.   Under 6 NYCRR § 750-2.7, a bypass, an upset or any other sewage-related incident shall be reported orally within two hours of becoming aware of the discharge, for discharges of untreated or partially treated sewage that would affect bathing areas during the bathing season or shell fishing, and within 24 hours for all areas. A written report of a bypass, upset or other sewage-related incidents shall also be provided within five (5) days of the time the permittee becomes aware of the circumstances. In addition, this provision calls for a duty to mitigate: "The permittee shall take all reasonable steps to minimize or prevent any discharge in violation of the permit, which has a reasonable likelihood of adversely affecting human health or the environment."

105.   Under 6 NYCRR § 750-2.9, Additional Conditions Applicable to a Publicly Owned Treatment Works, a POTW has an obligation to "enact, maintain and enforce or cause to be enacted, maintained and enforced up-to-date and effective sewer use law in all parts of the POTW service area. Such enactment and enforcement shall include intermunicipal agreements and/or other enforceable legal instruments that allow the

permittee to control discharges, either directly or through jurisdictions contributing flows to the POTW, flow and loads to the POTW as well as discharges to the POTW."

## COUNTY OF NASSAU'S CONTRACT BETWEEN NASSAU COUNTY AND UNITED WATER

106.    Studies conducted by governmental and not for profit experts have determined that inflow into outdated sewage treatment plants is due to infiltration into aged sewer pipes. The average home in the COUNTY OF NASSAU is over Fifty (50) years old. The cast iron sewer pipes buried in the front yards of these homes are over Fifty (50) years old. The Federal Congressional Budget Office and the EPA estimates that the lifespan of a cast iron sewer line is Fifty (50) years. Thus, these sewer lines must be repaired or replaced to prevent infiltration and inflow, thereby allowing the COUNTY OF NASSAU sewer collection systems and wastewater treatment plants to function effectively, without leaking into the ground, aquifers and overflowing into the Long Island Sound and the Great South Bay. Excess infiltration and inflow into the COUNTY OF NASSAU sewer system results in the unlawful and unpermitted discharge of raw and untreated sewage into waters and tributaries surrounding and adjacent to the COUNTY OF NASSAU.

107.    EPA studies have revealed that corrosion of outdated sewer lines result in sewer line failure, with a recent survey showing almost half of all cities surveyed reporting sewer collapses from corrosion.

108.    When GLEN COVE agreed to assign its operating contract with SEVERN TRENT and assigned its ownership of the GLEN COVE sewage treatment facility to the COUNTY OF NASSAU under the CONSOLIDATION AGREEMENT, the COUNTY

OF NASSAU failed to protect its citizens by ensuring that private sewer laterals in the CITY OF GLEN COVE would continue to be maintained under the SEVERN TRENT CONTRACT by UNITED WATER in the UNITED WATER CONTRACT. In fact, while UNITED WATER agreed in its contract with the COUNTY OF NASSAU to comply with all laws and rules applicable under the CWA, the UNITED WATER CONTRACT specifically excluded the part of the COUNTY OF NASSAU sewer collection system on private property, that being, private laterals. While UNITED WATER agreed to operate the COUNTY OF NASSAU "Managed Assets" in the UNITED WATER CONTRACT in such a manner that influent, effluent, or residuals would not contaminate, bypass, leak or spill on or into the environment, UNITED WATER limited its responsibility to the COUNTY OF NASSAU sewer collection system, and the residents of the COUNTY OF NASSAU, by eliminating private sewer laterals from its responsibilities under the UNITED WATER CONTRACT. The State's DEC regulations require the permit holder of a POTW to identify all inflow to the tributary system and remove excessive infiltration and inflow. (750-2.9) The COUNTY OF NASSAU has illegally delegated and assigned this responsibility to UNITED WATER. However, UNITED WATER has disclaimed this requirement in the UNITED WATER CONTRACT.

109.    The UNITED WATER requirements under the UNITED WATER CONTRACT apply to the COUNTY OF NASSAU sewer collection system, "consisting generally of storm water sewers, inlets, catch basins, manholes and outfalls, pump stations and pipes, together with all improvements thereto acquired, installed, constructed or reconstructed from time to time." In order to perform required maintenance items, UNITED WATER

agreed to conduct scheduled inspections and routine cleaning (including televising and flushing) of the COUNTY OF NASSAU wastewater collection system in accordance with state and federal law.  The contract states that the COUNTY OF NASSAU is and shall remain the owner of all influent and effluent and the receipt of excessive influent in the sewer system.  UNITED WATER disclaims all responsibility for non-COUNTY OF NASSAU owned sewer collection systems and specifically disclaims influent originating in non-COUNTY OF NASSAU owned sewer systems. Thus, the UNITED WATER CONTRACT leaves COUNTY OF NASSAU residents unknowingly without the coverage of the SEVERN TRENT CONTRACT, with no public education regarding their private sewer laterals, the condition and repair of those laterals, and without an economic or cost efficient program to repair those private property laterals. The COUNTY OF NASSAU and its residents will continue to be left in the dark as to the condition of public and private sewer lines and laterals in the COUNTY OF NASSAU during the Twenty (20) year duration of the UNITED WATER CONTRACT.

110.    The UNITED WATER contract with the COUNTY OF NASSAU is in violation of the CWA in that it gives UNITED WATER the incentive to increase, not decrease, the amount of infiltration into the COUNTY OF NASSAU sewer collection system and the wastewater treatment facilities owned by the COUNTY OF NASSAU. The UNITED WATER CONTRACT provides an increase over the yearly budgeted amount payable to UNITED WATER if UNITED WATER is required to treat additional infiltration. Additionally, UNITED WATER will never receive any less funding under the UNITED WATER CONTRACT if the amount of infiltration is reduced as required by law, since under the UNITED WATER CONTRACT "There shall be no flows and loadings

elements adjustment as a credit to the County for actual flow and load values which are below the threshold values listed above". These provisions violate CWA laws and regulations by failing to require UNITED WATER, and the operator of the COUNTY OF NASSAU POTW, to comply with CWA and DEC regulations that require the owner or operator of a POTW to reduce infiltration.  Since the SPEDES permit issued to the COUNTY OF NASSAU GLEN COVE wastewater treatment plant requires that the operator of that treatment plant reduce infiltration, the COUNTY OF NASSAU has unlawfully assigned its SPEDES requirement to UNITED WATER. The UNITED WATER CONTRACT is unconscionable, unlawful and violates the CWA.

111.    The COUNTY OF NASSAU has negligently placed its residents and citizens in a position of violating the CWA and exposing those residents and citizens to potential fines in the millions of dollars for violations of the CWA going back years, and continuing into the future. The COUNTY OF NASSAU may not assign its responsibilities to enforce its sewer ordinance to a private party. The COUNTY OF NASSAU has failed to inform and educate its residents about the requirement of the CWA and their residents' exposure to fines and increased sewer rates. Since private sewer laterals were left out of the UNITED WATER CONTRACT, and the COUNTY OF NASSAU sewer collection system was redefined to the benefit of UNITED WATER and to the detriment of the COUNTY OF NASSAU and its residents, Plaintiff ROBERT VITIELLO asks that the Court address the illegality of the UNITED WATER contract with COUNTY OF NASSAU in this action and enter a declaratory judgment that the UNITED WATER is illegal, unconscionable and void as a matter of public policy, so that the interests of residents of the COUNTY OF NASSAU are protected.

## THE UNITED WATER CONTRACT DEFICIENCIES

112.    In order to fully understand the effect of the UNITED WATER CONTRACT on

the residents of the COUNTY OF NASSAU, public hearings were required to address the

issues raised in this complaint. However, the legislative process did not permit proper

citizen and expert input to deal with this issue of infiltration, lack of compliance and the

ultimate impact of the proposed UNITED WATER CONTRACT on the COUNTY OF

NASSAU and its residents. After all, this was a contract that would shift the

responsibility of the entire sewer collection system and wastewater treatment facilities

from the government, COUNTY OF NASSAU, to a private company, UNITED

WATER. The proposed contract would take sewer fees in the amount of Fifty Seven

Million, Four Hundred Thousand ($57,400,000.00) Dollars from residents of the

COUNTY OF NASSAU and give that amount every year, for Twenty (20) years, to

UNITED WATER.  Shockingly, speakers at the COUNTY OF NASSAU Legislative

hearing addressing the UNITED WATER contract were limited to Three (3) minutes to

address the Legislature on this important issue.  Additionally, NIFA voted on the

UNITED WATER CONTRACT in less than Five (5) minutes, relying on information

provided to NIFA by the COUNTY OF NASSAU that has not been released pursuant to

a FOIL request. While the initial Request for Proposal ("RFP") was first issued by the

COUNTY OF NASSAU on December 22, 2011, and the COUNTY OF NASSAU

originally selected UNITED WATER as the preferred proposer on May 3, 2012, the

COUNTY OF NASSAU waited until September, 2014, to enter into the UNITED

WATER CONTRACT, and made no effort during that Four (4) year period to issue a

new RFP or identify the current condition of the GLEN COVE wastewater treatment

facility. The UNITED WATER CONTRACT took effect on January 1, 2015.

113.    During the Four (4) year period from the RFP to the entering of the UNITED

WATER CONTRACT, the COUNTY OF NASSAU, SEVERN TRENT and UNITED

WATER took no action to identify the condition of private sewer laterals in the

COUNTY OF NASSAU; review the UNITED WATER CONTRACT for compliance

with the CWA and the responsibility of maintaining and inspecting private property

laterals in the COUNTY OF NASSAU; examine the responsibilities of UNITED

WATER for the POTW in the COUNTY OF NASSAU; nor examine the compliance of

the COUNTY OF NASSAU GLEN COVE wastewater treatment facility for CWA

compliance. If these actions had taken place, the COUNTY OF NASSAU and UNITED

WATER would have known that the GLEN COVE wastewater treatment facility was out

of compliance, as aforesaid, for years and in violation due to very serious contaminating

conditions. Thus, at the time the COUNTY OF NASSAU entered the UNITED WATER

CONTRACT, and at the time NIFA approved the UNITED WATER CONTRACT, no

party to the UNITED WATER CONTRACT, the COUNTY OF NASSAU, SEVERN

TRENT, and UNITED WATER, knew or disclosed that the GLEN COVE wastewater

treatment facility was in non-compliance and had been since July 1, 2014. This fact was

not disclosed by the COUNTY OF NASSAU in its memorandum of July 14, 2014 to the

NASSAU COUNTY Legislative Budget Office, to NIFA, nor to the residents of the

COUNY OF NASSAU. Since taking over the sewer collection system and the COUNTY

OF NASSAU wastewater treatment plants, UNITED WATER and the COUNTY OF

NASSAU have taken no actions to seek compliance with any of the infrastructure in the

COUNTY OF NASSAU and the responsibilities of UNITED WATER have been contracted with the COUNTY OF NASSAU to lessen the responsibility of UNITED WATER to maintain private sewer laterals, reduce inflow and require SEVERN TRENT to repair the serious deficiencies at the GLEN COVE wastewater treatment facility so prevent further contamination of the Long Island Sound, the Great South Bay and ground water and aquifers. The UNITED WATER CONTRACT is illegal and unconscionable and damaging to the environment and to residents of the COUNTY OF NASSAU. UNITED WATER publicly announced that they would provide monthly and daily monitoring reports to the COUNTY OF NASSAU and the DEC. UNITED WATER represented that these reports would be accessible to residents of the COUNTY OF NASSAU on the UNITED WATER website, but UNITED WATER has failed to provide this information. UNITED WATER agreed in the UNITED WATER CONTRACT to provide to the COUNT OF NASSAU monthly reports summarizing plant operations but UNITED WATER has failed to provide those reports. As of the filing of this complaint, UNITED WATER has failed to provide reports except those for December 2014, one month prior to the commencement date of the UNITED WATER CONTRACT.

114.    The COUNTY OF NASSAU failed to establish a sewer system assessment program for its wastewater treatment plants and its sewer collection system. The COUNTY OF NASSAU was required to undertake field tests and inspections to diagnose problems with its sewer collection system and to identify and establish solutions for reducing I & I flows and unpermitted discharges.  The COUNTY OF NASSAU is not the only county in the United States that is faced with a deteriorating infrastructure system. The COUNTY OF NASSAU is not alone in experiencing daily overflow in their sanitary

sewer systems during periods of rain. However, most municipalities are aware of their

obligations regarding excessive I & I and unlawful contamination from treatment plants

as these excess and illicit flows and discharges are violate the CWA. The COUNTY OF

NASSAU does not have a plan for closed circuit television ("CCTV"), fog testing or dye

testing, or other methods, for the examination of sewer lines and laterals to determine the

condition of these public and private sewer infrastructure. Without a plan, the COUNTY

OF NASSAU is permitting its sewer infrastructure to rapidly deteriorate and to ultimately

leave residents with shattered and ineffective sewer lines discharging raw sewage directly

into the ground on public and private property.

115.    Municipalities have a continuing obligation to maintain and repair the tributary

sewer systems within their borders such that they comply with the CWA. The COUNTY

OF NASSAU fails horribly in complying with this important obligation. Flow monitoring

at the COUNTY OF NASSAU wastewater treatment facilities disclose the condition of

the sewer infrastructure so that the COUNTY OF NASSAU, UNITED WATER and the

residents of the COUNTY OF NASSAU can monitor increased flow at times of high tide

and rainfall to determine the extent of excessive inflow into the wastewater treatment

facility. Unfortunately, although UNITED WATER is aware that millions of gallons of

wastewater pass through the COUNTY OF NASSAU treatment plants, and that flow

rates are important to be observed, this information is still not present on the UNITED

WATER website so that residents, conservation groups and the government cannot

monitor and observe the results of flow monitoring. PLAINTIFF ROBERT VITIELLO

submits that this delay is deliberate so that the condition of the sewer infrastructure in the

COUNTY OF NASSAU is not able to be determined and that this failure to disclose this

imperative information is in violation of the UNITED WATER CONTRACT and the CWA.

## GENERAL ALLEGATIONS

116.   Plaintiff repeats and reiterates all of the allegations contained in paragraphs "1" to "115".

117.   At all relevant times, the COUNTY OF NASSAU has owned, operated and maintained responsibility for wastewater treatment plants and the associated sewer collection and transmission systems, which receives and treats wastewater from residential, commercial, industrial sewage sources within the COUNTY OF NASSAU.

118.   The manholes, sewer lines, outfalls, wastewater treatment facilities and various other confined discrete conveyances within the sanitary collection system from which pollutants are discharged, are "point sources," within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

119.   The COUNTY OF NASSAU is responsible for the enforcement of its sewer use ordinance which regulates discharges that are "point sources," within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14) in the COUNTY OF NASSAU.

120.   The COUNTY OF NASSAU'S sewer system is intended to keep sewage and other wastewater in the collection system without unlawful discharge or leak and to keep rainwater out of the collection system, so that the sewer system discharges directly into the COUNTY OF NASSAU'S sewer treatment plants.

121.   At all relevant times, the COUNTY OF NASSAU has "discharged pollutants," including raw sewage, from "point sources" within the meaning of Section 502(14) of the

CWA, 33 U.S.C. § 1362(14), to waters of the United States, including, inter alia, the Long Island Sound, Great South Bay, groundwater, aquifers and tributaries, within the meanings of Section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7) and the federal regulations implementing the CWA at 40 C.F.R. § 122.2.

122.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342 and the New York Clean Water Law, Chapter 644 of the New York Revised Statutes, and the implementing regulations at 10 CSR 20-1.010, the COUNTY OF NASSAU was issued a NPDES permit for its wastewater treatment systems.

123.    At all relevant times, the COUNTY OF NASSAU has violated, and continues to violate, Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342, by failing to meet the conditions contained in the NPDES permits and by discharging and permitting pollutants to be discharged in violation of issued SPEDES and NPDES permits.

124.    These discharges of untreated wastewater from the COUNTY OF NASSAU'S sewer system contribute high levels of pollutants, including sewage, heavy metals, toxics, oil and grease, solvents, nutrients, viruses, and bacteria to water bodies receiving discharges from outfalls and leaking sewer lines and laterals. Health risks associated with sewage in water can expose humans and fish to a variety of bacterial pathogens, including E-Coli. Diseases associated with waterborne infections include gastroenteritis, hepatitis, skin infections, wound infections, conjunctivitis, respiratory infections and generalized infections. Swimming sometimes results in the unintentional ingestion of recreation water contaminated with pathogens, which can lead to illness. Fecal contaminated waters can cause illness of the ear, eyes and skin.

125.    These unpermitted discharges at the GLEN COVE wastewater treatment facility are documented on the ECHO site.

126.    The COUNTY OF NASSAU has failed to enforce its sewer use ordinance by the issuance of summonses, citations and orders; by failing to educate residents regarding the sewer use ordinance and the causes of violations of that ordinance; by failing to enforce the terms of its contract with SEVERN TRENT and UNITED WATER upon learning of unpermitted discharges; and by failing to undertake a program for the repair and maintenance of private sewer laterals to assist residents of the COUNTY OF NASSAU to comply with the laws, rules and regulations that apply to the CWA and the COUNTY OF NASSAU sewer use ordinance.

127.    The COUNTY OF NASSAU'S unpermitted discharges of raw sewage have resulted from multiple causes including, inter alia, inadequate flow capacity in the collection system and at the wastewater treatment plants; inability to use wastewater pumps at capacity due to aged and corroded pipes and force mains; illegal and improper cross-connections between sanitary sewers and poor maintenance of its collection system including breaks and blockages in sewer pipes, force mains and manholes.

128.    The COUNTY OF NASSAU failed to inspect sewer lines and report the results to the DEC and EPA, and take steps to identify and remedy leaking laterals that contaminate waterways and aquifers. Testing, repair, maintenance, renovation and replacement of private and public sewer laterals would create compliance with the CWA, the EPA, and the DEC by reducing I & I and SSO's.

129.    The COUNTY OF NASSAU failed to prevent SSO's by failing to study and fix leaking sewer laterals.

130.    The COUNTY OF NASSAU failed to require property owners to repair and replace leaking sewer systems.

131.    The COUNTY OF NASSAU failed to maintain reports as required by the CWA.

132.    Despite significant water quality violations associated with discharges from its sewer system, the COUNTY OF NASSAU has not updated its sewer system to satisfy CWA requirements  – including but limited to the requirement that it reduce the discharge of pollutants to the maximum extent practicable – and to incorporate measures or controls necessary to ensure compliance with the permit's prohibitions against the violation of water quality standards, the discharge of toxins in toxic amounts and the discharge of dangerous amounts of Mercury.

133.    The COUNTY OF NASSAU failed to establish and initiate a program for the testing, repair, maintenance, renovation and timely replacement of public and private building and private property sewer laterals connected to the COUNTY OF NASSAU'S waste water collection system, designed to protect the public health, safety and welfare of the COUNTY OF NASSAU by preventing and mitigating harmful discharges of untreated waste and wastewater into the environment through leaking and unsound sewer laterals.

134.    The COUNTY OF NASSAU failed to establish a comprehensive program that enforces routine maintenance of public and private property sewer laterals, which fosters compliance with the requirements of the CWA and the EPA. This comprehensive program must have established a system for the reduction of I and I, and sewer system spills and overflows and I and I to the sanitary sewer system.

**FIRST CLAIM FOR RELIEF: VIOLATION OF THE PROPER OPERATION
AND MAINTENANCE CONDITIONS CONTAINED IN THE COUNTY OF
NASSAU'S SPDES AND NPDES PERMIT**

135.    Plaintiff repeats and reiterates all of the allegations contained in paragraphs "1" to "134".

136.    Pursuant to 40 C.F.R.  § 122.41(e), each of the COUNTY OF NASSAU'S NPDES permits contain the following standard condition at Part 1.B.3:  "Permittees shall operate and maintain facilities to comply with the New York Clean Water Law and applicable permit conditions.  Operators or supervisors of operations at publicly owned or publicly regulated wastewater treatment facilities shall be certified in accordance with 10 CSR 209.020(2) and any other applicable law or regulation."  Part I.B.4 of the COUNTY OF NASSAU'S permit require that "the permittee shall take all necessary steps to minimize any adverse impact to waters of the state resulting from noncompliance with any effluent limitations specified in this permit or set forth in the New York Clean Water Law and Regulations" (hereafter Part I.B.3&4 collectively referred to as "Proper Operation and Maintenance Condition".

137.    The COUNTY OF NASSAU is required to comply with its permit by employing the best practicable control technology available to meet its NPDES permit. Controls must include the proper operation and maintenance of the COUNTY OF NASSAU sewer system and its wastewater treatment plants. Without compliance with its permit, the COUNTY OF NASSAU causes an imminent danger that discharges from private and public sewer lines and laterals, and the plants, will cause ecological pollution and health risks. In fact, the current ECHO site clearly illustrates the result of the COUNTY OF NASSAU'S failure to comply with its permit and CWA obligations.

138.  The illegal discharges alleged in this complaint resulted, in whole or in part, from the COUNTY OF NASSAU'S failure to comply with the "Proper Operation and Maintenance Condition" of its NPDES Permits (Part I.B.3&4), in violation of Section 402 of the CWA, 33 U.S.C. § 1342.

139.  Each day the COUNTY OF NASSAU fails to comply with the "Proper Operation and Maintenance Condition" of its NPDES permits (Part 1.B.3&4) constitutes a separate violation of Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342.

140.  It is respectfully requested that the Court issue fines and penalties pursuant to the CWA against the COUNTY OF NASSAU. The total amount of fines to be imposed against the County of Nassau, from the notice date of September 22, 2015 to present, are in the amount of $51,570 per day for each violation until January 14, 2017, and $52,414 per day for each violation subsequent to January 14, 2017, pursuant to Section 309 of the Clean Water Act, 33 U.S.C. § 1319(d) and the Federal Civil Penalties Inflation Adjustment Act of 1990, for a total fine of Fifty Seven Million, Seven Hundred Seventy Four Thousand ($57,774,420.00) Dollars.

141.  Unless enjoined by an order of the Court, the COUNTY OF NASSAU will continue to violate Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342, by failing to comply with the "Proper Operation and Maintenance Condition" of its NPDES permits (Part I.B.3&4).

142.  The COUNTY OF NASSAU must be required to submit an assessment of its collection system, including its private property collection/lateral system. This assessment will assist in making a determination as to the condition of the COUNTY OF NASSAU collection system infrastructure, the prevention of future SSO's, the prevention

of future lateral leaks, and the methods to test, analyze and repair leaking laterals to prevent I & I and the resulting SSO's. The report must address causes of SSO's; short-term and long-term actions required to address deficiencies; and a schedule for implementation of an action plan.

143. No later than the Effective Date, the City shall begin developing a written Capacity, Management, Operation, and Maintenance ("CMOM") Program to enhance its existing programs related to management, operation, and maintenance of its WCTS. The CMOM Program shall establish, and describe in writing, how the City will implement the requirements of Subsection Components A.1) ("Training Program") through A.11) ("Information Management System") of this Subsection within the timeframes provided and shall be developed in accordance with EPA's 2005 Guidance titled "Guide for Evaluating Capacity, Management, Operation, and Maintenance Programs at Sanitary Sewer Collection Systems." The CMOM Program shall be sealed by a registered professional engineer licensed to practice in the State of Texas, demonstrating that the Program has been developed in accordance with EPA's 2005 Guidance and sound engineering practices. The City shall submit its CMOM Program to EPA and TCEQ initially in only partial form as an "Interim CMOM Program" and then subsequently and completely as a "Final CMOM Program," in accordance with the terms of Paragraphs 14 through 16.

144. The City shall develop a SORP that includes, at a minimum, the following components: a. a listing of identified goals for the SORP, including that the City: i. respond to SSOs as rapidly as possible with a response goal of less than four (4) hours after Tyler first discovers or is notified of a potential overflow; ii. halt SSOs as rapidly as

feasible; iii. employ SSO mitigation measures whenever appropriate; 18 Case 6:17-cv-00029 Document 2-1 Filed 01/17/17 Page 22 of 146 PageID #: 56 iv. employ measures to prevent SSO recurrence; and v. report SSOs timely and completely in accordance with the requirements of Subsection Component A.3) ("SSO Reporting and Documentation Procedures"); b. a description of the actions Tyler will undertake to provide notice to the public and to any applicable government authorities of the occurrence of an SSO from the WCTS as required by TWC § 26.039 and 30 TAC § 319.303, and any amendments thereto, the City's TPDES Permits, or other applicable law; c. written Standard Operating Procedures (SOPs) for responding to SSOs that are designed to minimize SSO volumes and minimize the environmental impacts and potential human health risks of SSOs; d. an adequate methodology for estimating the volume of an SSO; e. additional written SOPs for specifically responding to Building/Private Property Backups, which shall include the following non-exclusive list of specific procedures: i. a description of Tyler's response practices and methods for communicating with customers about: A. how to report Building/Private Property Backups; and B. how to contact Tyler in order to obtain support in responding to a Building/Private Property Backup; ii. the typical timeframe objectives for both initial response and completion of cleanup activities; iii. the types of measures that may be taken by Tyler to cleanup Building/Private Property Backups found to be caused by conditions in Tyler's WCTS, including, as warranted by specific circumstances, procedures necessary to 19 Case 6:17-cv-00029 Document 2-1 Filed 01/17/17 Page 23 of 146 PageID #: 57 disinfect and/or remove items potentially contaminated by Building/Private Property Backups, wet vacuuming or other removal of spillage, wiping floors and walls with cleaning solution and disinfectant, flushing out and

disinfecting plumbing fixtures, carpet cleaning and/or replacement or other appropriate measures to disinfect and/or remove items potentially contaminated by Building/Private Property Backups; and iv. a description of the process by which measures to correct or repair conditions in the WCTS causing or contributing to Building/Private Property Backups are selected; f. an inspection of each Sewer Segment that experiences an SSO using CCTV as soon as practicable, but in any event not later than five (5) business days following the cessation of the SSO. Such inspection shall at a minimum extend at least through the first adjacent Sewer Segment upstream and downstream of the specific WCTS asset experiencing an SSO; g. identification of appropriate measures to prevent SSO recurrence, including, but not limited to, identifying the known or suspected cause of each SSO, if possible; eliminating material causing sewer blockages that result in SSOs; and/or identifying capacity limitations; h. a description of standard response procedures for SSOs that occur at Lift Stations or Force Mains. In the event that a repair at a Lift Station or Force Main may cause or lengthen the time of an SSO, the SORP shall provide a procedure for determining when a wastewater pump-around will be provided;

145.    The COUNTY OF NASSAU must be required to educate the public, and themselves, on the impact that Hydrogen Sulfide has on the public side of the collection system as well as on the private side. Hydrogen Sulfide results from the conversion of hydrogen sulfide gas converting to sulfuric acid in the presence of moisture within sewer pipes and it then directly attacks cast iron, the material used for sewer pipes on private property in the COUNTY OF NASSAU. Hydrogen Sulfide gas is responsible for the corrosion of sewer pipes including connections and other metal components in the collection system. Corrosion occurs most frequently in gravity sewers in which oxygen is

depleted due to the activity of microorganisms where there is limited velocity of sewage, such as a sewer lateral on private property. The damage caused by these gases is on the top of the sewer lateral resulting in a crack that permits the infiltration of groundwater and rainwater into the collection system, as well as the exfiltration of the raw sewage in the sewer lateral that escapes and contaminates the surrounding soil, ultimately travelling to the sole source aquifer that provides drinking water to Long Island residents. The infiltration of ground water and rain water causes excess flow to the collection system and ultimately to the COUNTY OF NASSAU wastewater treatment facilities where overflows occur. The COUNTY OF NASSAU has been on notice each time a SSO occurs, and by compiling and reporting their own daily monitoring reports that are required by SPDES and NPDES permits. The COUNTY OF NASSAU has failed to file reports, and has filed reports with violations of their permits, and these long term violations have not only put the COUNTY OF NASSAU on notice of CWA violations, but they are direct evidence of the willingness of the COUNTY OF NASSAU to violate the CWA and pay fines rather than take steps to remedy the problems, educate the public, provide programs to the public to assist in repairing the private side, and to take steps to monitor, inspect, repair and replace the sewer collection infrastructure in the COUNTY OF NASSAU that is beyond its lifespan and is damaged and leaking.

146.    The COUNTY OF NASSAU must be required to compile an accurate and up-to-date mapping program showing the exact location of all private property sewer laterals and spur connections of those laterals. A mapping program is required by the EPA and must be available to prevent cross-boring and damage to not only underground sewer laterals but to other infrastructure such as water lines and telephone cables. The

COUNTY OF NASSAU permits the digging of trenches on private property without the

knowledge of the location of buried sewer pipes, and also permits cross connections and

open connection ends of sewer laterals to continue in use while those laterals permit

exfiltration of raw sewage into the ground. The COUNTY OF NASSAU has been on

notice of the need for a mapping program for years, not only due to inspection reports

from their own Department of Public Works, but from reports that address the serious

problems that occur as the result of a lack of accurate maps. The American Public Works

Association reports that an underground utility line is hit, on average, every 60 seconds,

costing billions of dollars in the United States, creating safety issues and leaks.


### SECOND CLAIM FOR RELIEF
### VIOLATION OF THE NONREPORTING CONDITION OF COUNTY OF
### NASSAU'S SPDES AND NPDES PERMITS

147.    Plaintiff repeats and reiterates all of the allegations contained in paragraphs "1" to "146".

148.    The COUNTY OF NASSAU failed to report to residents, the public and other

municipalities that it was in violation of the CWA as contained in the ECHO site, so that

said noncompliance could be addressed in the UNITED WATER CONTRACT and so

that the COUNTY OF NASSAU Legislature, NIFA, clean water groups, individuals,

citizens and residents could be made aware so that public education could be created and

the public could address the issue at public hearings. This failure to report caused the

UNITED WATER CONTRACT to avoid any requirement of compliance with the CWA,

the EPA and the DEC regarding pollution and contamination from the COUNTY OF

NASSAU sewer system. This failure to report permitted SEVERN TRENT to continue

operating the GLEN COVE wastewater treatment facility in violation of the CWA, in

violation of the SEVERN TRENT CONTRACT, and permitted UNITED WATER under the UNITED WATER CONTRACT to avoid taking any action to require compliance with the GLEN COVE wastewater treatment facility, and, thus, causing the COUNTY OF NASSAU to be in violation of the CWA.

149.    Upon information and belief, the COUNTY OF NASSAU will continue to discharge pollutants to waters of the United States in violation of Section 301(a) of the CWA, 33 U.S.C § 1311(a), unless restrained by this Court.

150.    The COUNTY OF NASSAU is liable for civil penalties of up to $27,500 per day for each violation occurring between January 30, 1997 and March 15, 2004; up to $32,500 per day for each violation occurring between March 16, 2004 and January 12, 2009; and up to $37,500 per day for each violation occurring after January 12, 2009, pursuant to Sections 309(b) and (d) of the CWA, 33 U.S.C.  §§ 1319(b) and (d); and from the notice date of September 22,2015 to present, in the amount of $51,570 per day for each violation until January 14, 2017, and $52,414 per day for each violation subsequent to January 14, 2017, pursuant to Section 309 of the Clean Water Act, 33 U.S.C. § 1319(d) and the Federal Civil Penalties Inflation Adjustment Act of 1990, for a total fine of Fifty Seven Million, Seven Hundred Seventy Four Thousand ($57,774,420.00) Dollars.

151.    Unless enjoined by an order of the Court, upon information and belief, the COUNTY OF NASSAU will continue to violate Sections 301(a) and 402 of the CWA, 33 U.S.C.  §§ 1311(a) and 1342, by failing to comply with the Noncompliance Reporting Condition in its NPDES Permits (Part LB.2.b). The Plaintiff seeks an order of this Court requiring the COUNTY OF NASSAU to report all current leaks and breaks in the COUNTY OF NASSAU sewer system, and compliance of sewer treatment plants, to the

public and to required municipal agencies. The Plaintiff seeks an order of this Court

requiring compliance reports as required by the EPA; and every month identifying,

specifically, all illicit discharges from lateral connections and sanitary sewer defects,

addressing the date, flow amount, cost of removal of the discharge, the date of removal of

the discharge, and an explanation for late removal of the discharge.


## THIRD CLAIM FOR RELIEF
## VIOLATION OF THE SPECIAL CONDITIONS OF COUNTY OF NASSAU'S SPDES AND NPDES PERMITS

152.    Plaintiff repeats and reiterates all of the allegations contained in paragraphs "1" to

"151".

153.    COUNTY OF NASSAU'S NPDES permits contain the following General Criteria

Special Condition:

(b) General Criteria.  The following general water quality criteria shall be

applicable to all waters of the State at all times. No water contaminant, by itself or

in combination with other substances, shall prevent the waters of the state from

meeting the following conditions:

(1) Waters shall be free from substances in sufficient amounts to cause the

formation of putrescent, unsightly or harmful bottom deposits or prevent full

maintenance of beneficial uses;

(2) Waters shall be free from oil, scum and floating debris in sufficient

amounts to

be unsightly or prevent full maintenance of beneficial uses;

(3) Waters shall be free from substances in sufficient amounts to cause

unsightly

color or turbidity, offensive odor or prevent full maintenance of beneficial uses;

and

(4) Waters shall be free from substances or conditions in sufficient

amounts to result in toxicity to human, animal or aquatic life.

154.    The COUNTY OF NASSAU GLEN COVE wastewater treatment plant

discharges of high Carbonaceous Oxygen Demands ("COD") levels, high Mercury levels

and high Suspended Solids levels create conditions whereby the receiving waters are

caused to increase in toxicity to animal and aquatic life.  Pathogens in raw sewage can

also cause a number of diseases in humans such as gastroenteritis, dysentery, and cholera.

These diseases are communicable, and may result in toxicity to humans and/or create a

significant human health hazard from incidental contact with these waters.

155.    On the occasions described herein, and upon information and belief continuing to

the present, the COUNTY OF NASSAU failed to comply with the General Criteria

Special Conditions of its NPDES Permits in violation of Section 402 of the CWA, 33

U.S.C. § 1342.

156.    Each day COUNTY OF NASSAU fails to comply with the General Criteria

Special Condition of its NPDES Permits constitutes a separate violation of Sections

301(a) and 402 of the CWA, 33U.S.C.  §§ 1311(a) and 1342.

157.    The COUNTY OF NASSAU failed to establish and initiate a program for the

testing, repair, maintenance, renovation and timely replacement of public and private

building and private property sewer laterals connected to the COUNTY OF NASSAU's

waste water collection system, designed to protect the public health, safety and welfare of the COUNTY OF NASSAU by preventing and mitigating harmful discharges of untreated waste and wastewater into the environment through leaking and unsound sewer laterals. The COUNTY OF NASSAU violates its special conditions by allowing contamination by allowing unchecked sewer lines and laterals as part of the COUNTY OF NASSAU sewer system to transport and leak untreated effluent which discharges in violation of the NPDES permit into water bodies.

158.    The COUNTY OF NASSAU failed to establish a comprehensive program that enforces routine maintenance of public and private property sewer laterals which fosters compliance with the requirements of the CWA and the EPA. This comprehensive program must have established a system for the reduction of infiltration and inflow, and sewer system spills and overflows.

159.    The COUNTY OF NASSAU failed to educate residents and establish a program to promote, maintain, correct, require and inspect private property sewer laterals, and failed to perform the following required acts:

a) Educate private property owners on financial and insurance coverage issues for fixing broken and leaking laterals;

b) Establish a review process for opening and closing permit applications to ensure that laterals problems are resolved at the particular building where the permit was approved and other buildings in the vicinity and in the COUNTY OF NASSAU, considering the related ages of lateral pipes, proximity to navigable waters, proximity to train tracks, and other issues that would permit the COUNTY OF NASSAU to understand and report raw sewage leaks and infiltration and

intrusion into the COUNTY OF NASSAU waste water system as required by the CWA;

c) Contact building owners and contractors performing repair work on private sewer laterals to determine the extent of the leak, the cause, the location, the adequacy of the repair, the cost of the repair, and the repairs made in other buildings by the contractor;

d) Close open permits for the repair of private sewer laterals to insure the preventing of the leak and continued discharge and contamination; and

e) Educate the residents of the COUNTY OF NASSAU in determining and resolving sewer lateral leaks and clogs, and provide a program to insure emergency service leak repair and detection to the COUNTY OF NASSAU residents, including information as to the cost of the program, the emergency contact numbers, the alternative for repair, and the lack of homeowners insurance and government assistance to perform the repair;

160.    The COUNTY OF NASSAU failed to establish a comprehensive program to enforce routine maintenance of private sewer laterals in compliance with the CWA, in order to reduce inflow and infiltration and sewer system spills and overflows. This failure causes a violation of the COUNTY OF NASSAU'S NPDES permit.

161.    The COUNTY OF NASSAU, by failing to regulate the maintenance of private sewer laterals, has failed to clarify for private property owners the design, operation, construction, maintenance and inspection of private sewer laterals, permitting an unhealthy condition to exist in the COUNTY OF NASSAU.

162.    The COUNTY OF NASSAU was on notice of private property sewer lateral discharges and failed to establish a program for the resolution of those lateral discharges. The COUNTY OF NASSAU was and is aware that private insurance policies contain general exclusions for water damage; including the back up of sewers and drains and for water below the surface of the ground including water leaks and flows. These exclusions cause a lack of repair and maintenance of private sewer laterals with no program in place for the COUNTY OF NASSAU to assist in the repair or replacement of private sewer laterals. State laws prohibit the use of public funds for private repairs so private property repairs must be provided as part of private service plans, which are commonly utilized by municipalities. The COUNTY OF NASSAU does not provide such a program, nor does the COUNTY OF NASSAU educate residents regarding funding sources for lateral rv.

163.    The COUNTY OF NASSAU must be subjected to litigation by the EPA and the DEC so that a consent decree may be negotiated between the COUNTY OF NASSAU and these agencies to protect the public. There is a significant and immediate need for this enforcement method since the COUNTY OF NASSAU has no plan for correction of these problems addressed above, neglects the important issues related to condition of the COUNTY OF NASSAU underground infrastructure, and refuses to comply with its permits with no operational plan nor monitoring to remedy any of the serious conditions that exist. The harsh reality is that the COUNTY OF NASSAU continues to discharge sewage into the Long Island Sound, the Great South Bay, and to local streams and tributaries, which has a negative impact on water quality and the environment, causing harmful algal blooms, dangerous toxins and harm the economy in the COUNTY OF

NASSAU. See, *A Partially Treated Problem: Overflows From Combined Sewers*, Office

of the New York State Comptroller, May, 2018

164.    Unless required to establish the programs identified herein, by an order of the

Court, COUNTY OF NASSAU will continue to violate Sections 301(a) and 402 of the

CWA, 33 U.S.C. § 1311(a) and 1342.  Accordingly, Plaintiff seeks the imposition of

fines as against COUNTY OF NASSAU and an Order directing COUNTY OF NASSAU

to comply with its requirements under the CWA. Plaintiff seeks an order requiring the

COUNTY OF NASSAU to establish a public education program and a program to

provide inspections and repairs to private sewer laterals with reports to the COUNTY OF

NASSAU. Plaintiff further seeks an order assessing civil penalties of up to $27,500 per

day for each violation occurring between January 30, 1997 and March 15, 2004; up to

$32,500 per day for each violation occurring between March 16, 2004 and January 12,

2009; and up to $37,500 per day for each violation occurring after January 12, 2009,

pursuant to Sections 309(b) and (d) of the CWA, 33 U.S.C.  §§ 1319(b) and (d); and from

the notice date of September 22,2015 to present, in the amount of $51,570 per day for

each violation until January 14, 2017, and $52,414 per day for each violation subsequent

to January 14, 2017, pursuant to Section 309 of the Clean Water Act, 33 U.S.C. § 1319(d)

and the Federal Civil Penalties Inflation Adjustment Act of 1990, for a total fine of Fifty

Seven Million, Seven Hundred Seventy Four Thousand ($57,774,420.00) Dollars.

**FOURTH CLAIM FOR RELIEF
VIOLATION OF THE CLEAN WATER ACT REQUIREMENTS THAT THE
COUNTY OF NASSAU TAKES STEPS TO PREVENT SANITARY SEWER
OVERFLOWS, REDUCE INFILTRATION, REDUCE CONTAMINATION,
UTILIZE WATER REUSE METHODS AND TO EDUCATE THE PUBLIC**

165.    Plaintiff repeats and reiterates all of the allegations contained in paragraphs "1" to "164".

166.    The COUNTY OF NASSAU failed to educate residents and establish a program to promote, maintain, correct, require and inspect private property sewer laterals, and failed to perform the following required acts:

a) Educate private property owners on financial and insurance coverage issues for fixing broken and leaking laterals;

b) Establish a review process for opening and closing permit applications to ensure that laterals problems are resolved at the particular building where the permit was approved and other buildings in the vicinity and in the COUNTY OF NASSAU, considering the related ages of lateral pipes, proximity to navigable waters, proximity to train tracks, and other issues that would permit the COUNTY OF NASSAU to understand and report raw sewage leaks and infiltration and intrusion into the COUNTY OF NASSAU waste water system as required by the CWA;

c) Contact building owners and contractors performing repair work on private sewer laterals to determine the extent of the leak, the cause, the location, the adequacy of the repair, the cost of the repair, and the repairs made in other buildings by the contractor;

d) Close open permits for the repair of private sewer laterals to insure the preventing of the leak and continued discharge and contamination; and

e) Educate the residents of the COUNTY OF NASSAU in determining and resolving sewer lateral leaks and clogs, and provide a program to insure

emergency service leak repair and detection to the COUNTY OF NASSAU residents, including information as to the cost of the program, the emergency contact numbers, the alternative for repair, and the lack of homeowners insurance and government assistance to perform the repair;

167.   The COUNTY OF NASSAU failed to establish a comprehensive program to enforce routine maintenance of private sewer laterals in compliance with the CWA, in order to reduce inflow and infiltration and sewer system spills and overflows. This failure causes a violation of the COUNTY OF NASSAU'S NPDES permit.

168.   The COUNTY OF NASSAU, by failing to regulate the maintenance of private sewer laterals, has failed to clarify for private property owners the design, operation, construction, maintenance and inspection of private sewer laterals, permitting an unhealthy condition to exist in the COUNTY OF NASSAU.

169.   The COUNTY OF NASSAU was on notice of private property sewer lateral discharges and failed to establish a program for the resolution of those lateral discharges. The COUNTY OF NASSAU was and is aware that private insurance policies contain general exclusions for water damage; including the back up of sewers and drains and for water below the surface of the ground including water leaks and flows. These exclusions cause a lack of repair and maintenance of private sewer laterals with no program in place for the COUNTY OF NASSAU to assist in the repair or replacement of private sewer laterals. State laws prohibit the use of public funds for private repairs so private property repairs must be provided as part of private service plans, which are commonly utilized by municipalities. The COUNTY OF NASSAU does not provide such a program, nor does the COUNTY OF NASSAU educate residents regarding funding sources for lateral rv.

170.    The COUNTY OF NASSAU must establish a current mapping program for all private property sewer laterals. This need was established by the EPA in *Handbook: Sewer System Infrastructure Analysis and Rehabilitation, 1991,* which recommended that all sewer lines be shown on authenticated maps, particularly in areas with high groundwater, flooding, and older sewer lines.  The COUNTY OF NASSAU is perfectly suited for the entire required mapping in that study. The COUNTY OF NASSAU must establish a program for utilize water reuse so that wastewater can be utilized to reduce overuse of Long Island's sole source for drinking water aquifer, reduce excess flows to the COUNTY OF NASSAU wastewater treatment plants, and prevent the unnecessary treatment of water that can be used beneficially rather than harmfully.

171.    Government Accounting Standards Board Statement 34 (GASB 34) includes both requirements for reporting of public infrastructure assets in a government's financial statement and options for reporting additional information by governments that use asset management systems. The COUNTY OF NASSAU must be required to comply with GASB standards (including condition assessment), begins with the field inspector, who records defects found in sewer mains, service laterals, manholes, catch basins, and/or pump stations. These defects are characterized based on a standard notation system that is used by all field inspectors. The collection system utility establishes the appropriate level of detail. Some utilities focus on structural defects found in primary sewer lines, while others extend the inspection and rating systems to nonstructural defects and service laterals, access holes, and pump stations. The defect data gathered in the field are entered into the asset management system to allow analysis of the overall structural integrity and operating condition of each component. Some asset management software applications

automatically evaluate the types and distribution of defects found in each component and assign a condition rating, while others allow the collection system manager to assign the rating manually. This analysis is then combined with the failure impact rating of the component to develop a prioritized condition rating. Components found to be in poor condition, or with severe defects and high failure impact ratings, should be addressed as soon as possible after they are discovered. Less severe defects can be prioritized for more frequent inspection or cleaning, repair, rehabilitation, or replacement. The overall system condition is then assessed based on the aggregated condition ratings of the components to determine whether or not the system condition meets the minimum condition levels.

172.    Unless required to establish the programs identified herein, by an order of the Court, COUNTY OF NASSAU will continue to violate Sections 301(a) and 402 of the CWA, 33 U.S.C. § 1311(a) and 1342.  Accordingly, Plaintiff seeks the imposition of fines as against COUNTY OF NASSAU and an Order directing COUNTY OF NASSAU to comply with its requirements under the CWA. Plaintiff also seeks an order requiring the COUNTY OF NASSAU to establish a public education program and a program to provide inspections and repairs to private sewer laterals with reports to the COUNTY OF NASSAU. THE COUNTY OF NASSAU must be required to establish a program for up-to-date system mapping to include private property sewer laterals, an inventory of the private side collection system assets, including age and condition, and up to date information related to sewer lateral structural and nonstructural defects, including type of defect, severity, location, and date of discovery pursuant to EPA and GASB standards.

173.    Unless required to establish the programs identified herein, by an order of the Court, COUNTY OF NASSAU will continue to violate Sections 301(a) and 402 of the

CWA, 33 U.S.C. § 1311(a) and 1342.  Accordingly, Plaintiff seeks the imposition of fines as against COUNTY OF NASSAU and an Order directing COUNTY OF NASSAU to comply with its requirements under the CWA. Plaintiff seeks an order requiring the COUNTY OF NASSAU to establish a public education program and a program to provide inspections and repairs to private sewer laterals with reports to the COUNTY OF NASSAU. Plaintiff further seeks an order assessing civil penalties of up to $27,500 per day for each violation occurring between January 30, 1997 and March 15, 2004; up to $32,500 per day for each violation occurring between March 16, 2004 and January 12, 2009; and up to $37,500 per day for each violation occurring after January 12, 2009, pursuant to Sections 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b) and (d); and from the notice date of September 22,2015 to present, in the amount of $51,570 per day for each violation until January 14, 2017, and $52,414 per day for each violation subsequent to January 14, 2017, pursuant to Section 309 of the Clean Water Act, 33 U.S.C. § 1319(d) and the Federal Civil Penalties Inflation Adjustment Act of 1990, for a total fine of Fifty Seven Million, Seven Hundred Seventy Four Thousand ($57,774,420.00) Dollars.

## FIFTH CLAIM FOR RELIEF
### VIOLATION OF THE CLEAN WATER ACT REQUIREMENTS THAT THE COUNTY OF NASSAU TAKES STEPS TO PREVENT SANITARY SEWER OVERFLOWS AND DEC REGULATIONS TO REDUCE INFILTRATION

174.    Plaintiff repeats and reiterates all of the allegations contained in paragraphs "1" to "173".

175.    Pursuant to 40 C.F.R. § 122.41(e), each of the COUNTY OF NASSAU'S NPDES permits contains the following standard condition at Part 1.B.3: "Permittees shall operate and maintain facilities to comply with the New York Clean Water Law and

applicable permit conditions. Operators or supervisors of operations at publicly owned or publicly regulated wastewater treatment facilities shall be certified in accordance with 10 CSR 209.020(2) and any other applicable law or regulation." Part I.B.4 of the COUNTY OF NASSAU'S permit require that "the permittee shall take all necessary steps to minimize any adverse impact to waters of the state resulting from noncompliance with any effluent limitations specified in this permit or set forth in the New York Clean Water Law and Regulations" (hereafter Part I.B.3&4 collectively referred to as "Proper Operation and Maintenance Condition".

176.    Under 6 NYCRR § 750-2.9, Additional Conditions Applicable to a Publicly Owned Treatment Works, a POTW has an obligation to "enact, maintain and enforce or cause to be enacted, maintained and enforced up-to-date and effective sewer use law in all parts of the POTW service area. Such enactment and enforcement shall include intermunicipal agreements and/or other enforceable legal instruments that allow the permittee to control discharges, either directly or through jurisdictions contributing flows to the POTW, flow and loads to the POTW as well as discharges to the POTW."

177.    The COUNTY OF NASSAU is obligated under 6 NYCRR § 750-2.9 to take steps to reduce infiltration, yet the COUNTY OF NASSAU has taken no steps to accomplish a reduction in infiltration that causes SSO's and damage to the environment. On the contrary, the COUNTY OF NASSAU entered a contract with UNITED WATER that provides an incentive to UNITED WATER fail to take steps to reduce infiltration so that additional funds are paid to UNITED WATER by the COUNTY OF NASSAU under the contract. This action is in direct violation of DEC Regulations and CWA laws and regulations.

178.    Unless required to establish the programs identified herein, by an order of the Court, COUNTY OF NASSAU will continue to violate Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342.  Accordingly, Plaintiff seeks the imposition of fines as against COUNTY OF NASSAU and an Order directing COUNTY OF NASSAU to comply with its requirements under the CWA. Plaintiff seeks an order requiring the COUNTY OF NASSAU to establish a public education program and a program to provide inspections and repairs to private sewer laterals with reports to the COUNTY OF NASSAU. Plaintiff further seeks an order assessing civil penalties of up to $27,500 per day for each violation occurring between January 30, 1997 and March 15, 2004; up to $32,500 per day for each violation occurring between March 16, 2004 and January 12, 2009; and up to $37,500 per day for each violation occurring after January 12, 2009, pursuant to Sections 309(b) and (d) of the CWA, 33 U.S.C.  §§ 1319(b) and (d); and from the notice date of September 22,2015 to present, in the amount of $51,570 per day for each violation until January 14, 2017, and $52,414 per day for each violation subsequent to January 14, 2017, pursuant to Section 309 of the Clean Water Act, 33 U.S.C. § 1319(d) and the Federal Civil Penalties Inflation Adjustment Act of 1990, for a total fine of Fifty Seven Million, Seven Hundred Seventy Four Thousand ($57,774,420.00) Dollars.

**PRAYER FOR RELIEF**

WHEREFORE, citizen complainant Plaintiff ROBERT VITIELLO respectfully requests that this Court provide the following relief:

I.    A permanent injunction enjoining the COUNTY OF NASSAU from any and all ongoing and future violations of the CWA by ordering compliance with the Act;

II.     A permanent injunction directing the COUNTY OF NASSAU to take all steps necessary to come into permanent and consistent compliance with the prohibition on unpermitted discharges contained in Section 301(a) of the CWA;

III.    A permanent injunction directing the COUNTY OF NASSAU to take all steps as are necessary to prevent or minimize the imminent and substantial risk to human health posed by pollutants (raw sewage) originating in its POTW, in accordance with Section 504(a) of the CWA, 33 U.S.C. § 1364(a);

IV.     A permanent injunction directing the COUNTY OF NASSAU to take all steps necessary to achieve permanent and consistent compliance with the CWA and the regulations promulgated there under, and all terms and conditions of its SPDES and NPDES permits;

V.      On each cause of action contained in this complaint, a judgment assessing civil penalties against the COUNTY OF NASSAU not to exceed $27,500 per day for each violation of the CWA occurring in an amount no less than  Twelve Million Seven Hundred Fifty Thousand ($12,750,000.00) Dollars from the date of noncompliance of the GLEN COVE wastewater treatment plant and from the notice date of September 22, 2015 to present in the amount of $51,570 per day for each violation until January 14, 2017, and $52,414 per day for each violation subsequent to January 14, 2017, pursuant to Section 309 of the Clean Water Act, 33 U.S.C. § 1319(d) and the Federal Civil Penalties Inflation Adjustment Act of 1990, for a total fine of Fifty Seven Million, Seven Hundred Seventy Four Thousand ($57,774,420.00) Dollars.

VI.     The requirement that the COUNTY OF NASSAU, within 60 days of the date of judgment herein, establish a public education and outreach program that uses a variety of

distribution methods to ensure that the COUNTY OF NASSAU'S educational messages reach all residents;

VII.     The requirement that the COUNTY OF NASSAU, within 60 days of the date of judgment herein, establish and submit a plan to remove and monitor illicit discharges from private sewer laterals; to establish a funding plan for immediate and future training, management and implementation of tasks to prevent SSO's, sewage leaks, lateral inspections, and education; to review its contracts for the operation of its sewer plant to ensure CWA compliance and to establish a program to repair private sewer laterals.

VIII.    Assessing penalties against point source polluters, including private property owners with leaking laterals, in the amount of $25,000.00 per day, with a stay of enforcement for a period of 60 days while the private property owner is offered the opportunity to have inspections and repairs of the private lateral covered under a private sewer lateral program; however, if it is determined that the COUNTY OF NASSAU has been negligent in complying with the allegations contained in this complaint, then fining private property owners from the date of the filing of this complaint as per statute;

IX.      On the Plaintiff's First Claim for Relief, an order finding COUNTY OF NASSAU liable for civil penalties and ordering a judgment assessing civil penalties against the COUNTY OF NASSAU not to exceed $27,500 per day for each violation of the CWA occurring in an amount no less than Twelve Million Seven Hundred Fifty Thousand ($12,750,000.00) Dollars from the date of noncompliance of the GLEN COVE wastewater treatment plan and from the notice date of September 22, 2015 to present in the amount of $51,570 per day for each violation until January 14, 2017, and $52,414 per day for each violation subsequent to January 14, 2017, pursuant to Section 309 of the

Clean Water Act, 33 U.S.C. § 1319(d) and the Federal Civil Penalties Inflation

Adjustment Act of 1990, for a total fine of Fifty Seven Million, Seven Hundred Seventy

Four Thousand ($57,774,420.00) Dollars and an Order requiring the COUNTY OF

NASSAU to perform an assessment of its collection system, including a complete

mapping of the public and private collection system, including its private property

collection/lateral system, that will assist in making a determination as to the condition of

the COUNTY OF NASSAU collection system infrastructure, the prevention of future

SSO's, the prevention of future lateral leaks, and the methods to test, analyze and repair

leaking laterals to prevent I & I and the resulting SSO's. The report must address causes

of SSO's; short-term and long-term actions required to address deficiencies; and a

schedule for implementation of an action plan.

X.      On the Plaintiff's Second Claim for Relief an order finding that COUNTY OF

NASSAU is liable for civil penalties and an order finding COUNTY OF NASSAU liable

for civil penalties and ordering a judgment assessing civil penalties against the COUNTY

OF NASSAU not to exceed $27,500 per day for each violation of the CWA occurring in

an amount no less than $12,750,000.00 from the date of noncompliance of the GLEN

COVE wastewater treatment plan and from the notice date of September 22, 2015 to

present in the amount of $51,570 per day for each violation until January 14, 2017, and

$52,414 per day for each violation subsequent to January 14, 2017, pursuant to Section

309 of the Clean Water Act, 33 U.S.C. § 1319(d) and the Federal Civil Penalties Inflation

Adjustment Act of 1990, for a total fine of Fifty Seven Million, Seven Hundred Seventy

Four Thousand ($57,774,420.00) Dollars and an order of this Court requiring the

COUNTY OF NASSAU to report all current leaks and breaks in the COUNTY OF

NASSAU sewer system, and the compliance of the sewer treatment plant, to the public

and to required municipal agencies as well as compliance reports as required by the EPA;

and every six months identifying, specifically, all illicit discharges from lateral

connections and sanitary sewer defects, addressing the date, flow amount, cost of

removal of the discharge, the date of removal of the discharge, and an explanation for late

removal of discharge.

XI.     On the Plaintiff's Third Claim for Relief, an order finding COUNTY OF

NASSAU liable for civil penalties and ordering a judgment assessing civil penalties

against the COUNTY OF NASSAU not to exceed $27,500 per day for each violation of

the CWA occurring in an amount no less than $12,750,000.00 from the date of

noncompliance of the GLEN COVE wastewater treatment plan and from the notice date

of September 22, 2015 to present in the amount of $51,570 per day for each violation

until January 14, 2017, and $52,414 per day for each violation subsequent to January 14,

2017, pursuant to Section 309 of the Clean Water Act, 33 U.S.C. 1319(d) and the Federal

Civil Penalties Inflation Adjustment Act of 1990, for a total fine of Fifty Seven Million,

Seven Hundred Seventy Four Thousand ($57,774,420.00) Dollars and to establish a

comprehensive program to enforce routine maintenance of private sewer laterals in

compliance with the CWA, in order to reduce inflow and infiltration and sewer system

spills and overflows; and

XII.    On the Plaintiff's Fourth Claim for Relief, an order finding COUNTY OF

NASSAU liable for civil penalties and ordering a judgment assessing civil penalties

against the COUNTY OF NASSAU not to exceed $27,500 per day for each violation of

the CWA occurring in an amount no less than $12,750,000.00 from the date of

noncompliance of the GLEN COVE wastewater treatment plan and from the notice date of September 22, 2015 to present in the amount of $51,570 per day for each violation until January 14, 2017, and $52,414 per day for each violation subsequent to January 14, 2017, pursuant to Section 309 of the Clean Water Act, 33 U.S.C. 1319(d) and the Federal Civil Penalties Inflation Adjustment Act of 1990, for a total fine of Fifty Seven Million, Seven Hundred Seventy Four Thousand ($57,774,420.00) Dollars and an order directing the COUNTY OF NASSAU, pursuant to 6 NYCRR § 750-2.9 to take steps to reduce infiltration; and

XIII.    On the Plaintiff's Fifth Claim for Relief, an order finding COUNTY OF NASSAU liable for civil penalties and ordering a judgment assessing civil penalties against the COUNTY OF NASSAU not to exceed $27,500 per day for each violation of the CWA occurring in an amount no less than $12,750,000.00 from the date of noncompliance of the GLEN COVE wastewater treatment plan and from the notice date of September 22, 2015 to present in the amount of $51,570 per day for each violation until January 14, 2017, and $52,414 per day for each violation subsequent to January 14, 2017, pursuant to Section 309 of the Clean Water Act, 33 U.S.C. 1319(d) and the Federal Civil Penalties Inflation Adjustment Act of 1990, for a total fine of Fifty Seven Million, Seven Hundred Seventy Four Thousand ($57,774,420.00) Dollars and an order directing the COUNTY OF NASSAU, pursuant to 6 NYCRR § 750-2.9 to take steps to reduce infiltration; and an Order directing COUNTY OF NASSAU to comply with its requirements under the CWA. Plaintiff seeks an order requiring the COUNTY OF NASSAU to establish a public education program and a program to provide inspections and repairs to private sewer laterals with reports to the COUNTY OF NASSAU and an

order directing that the COUNTY OF NASSAU is obligated under 6 NYCRR § 750-2.9

to take steps to reduce infiltration to accomplish a reduction in infiltration that causes

SSO's and damage to the environment.

XIV.    An order granting to the Plaintiff legal fees, costs and disbursements incurred in

this action pursuant to statute; and

XV.    Such other and further relief, as this Court deems appropriate.


Dated:  Mount Sinai, New York
          June 11, 2019

                                          Raymond Negron, Esq.
                                          Attorney for Plaintiff
                                          234 North Country Road
                                          Mount Sinai, New York 11766
                                          (631) 928-3244
                                          (631) 991-2005 (f)
                                          ffnegron@hotmail.com

## VERIFICATION

STATE OF NEW YORK )
                  )ss.:
COUNTY OF SUFFOLK)


**ROBERT VITIELLO,** being duly sworn, deposes and says:

1.      I am the Plaintiff in the within action.

2.      I have read the foregoing **COMPLAINT** and know the contents thereof; that the same is true to deponent's own knowledge, except as to the matters therein stated to be alleged on information and belief and that as to those matters deponent believes it to be true.


Dated:

Mount Sinai, New York
June 10, 2019

Robert Vitiello    Raymond Negron, ESQ

By COUNSEL who resides in a different
County than Plaintiff/Client


~~Sworn and Subscribed before me this 10th day of June, 2019~~